# United States Court of Appeals
## For the First Circuit

No. 14-2059

ROBERT NIEBAUER,

Plaintiff, Appellant,

v.

CRANE & CO., INC.; CRANE & CO., INC. EXECUTIVE SEVERANCE PLAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Barron, Selya, and Stahl,
Circuit Judges.

Robert A. Fisher, with whom Jonathan A. Keselenko, Christopher S. Feudo, and Foley Hoag LLP were on brief, for appellant.
David C. Casey, with whom Robert B. O'Brien and Littler Mendelson, P.C. were on brief, for appellees.

April 21, 2015

**STAHL, Circuit Judge**.  In this case arising under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., Plaintiff-Appellant Robert Niebauer alleges that the administrator of his former employer's executive severance plan denied him severance benefits after erroneously determining that he had retired voluntarily from his position.  See 29 U.S.C. § 1132(a)(1)(B).  Niebauer further alleges that his former employer improperly interfered with his rights under the plan, in violation of 29 U.S.C. § 1140.  The district court granted Defendants-Appellees summary judgment on both counts.  See Niebauer v. Crane, 44 F. Supp. 3d 147 (D. Mass. 2014).

Because we find that the plan administrator's decision to deny Niebauer's claim for benefits was both supported by substantial evidence and procedurally proper, we affirm the district court's judgment in that regard.  However, we vacate the district court's judgment as to the interference claim and remand for application of the correct standard of review.

## I.  Facts & Background[1]

At the time of the events in question, Robert Niebauer was the chief technology officer of Crane & Co., Inc. ("Crane").  Headquartered in Dalton, Massachusetts, Crane produces specialty

---

[1] As both parties and the district court did, we draw the facts from the full summary judgment record.  We detail infra the specific information and documents that were before the plan administrator when it made its decisions.

-2-

paper products, including the banknote paper used for printing United States currency.

Crane maintains an executive severance plan ("plan"), under which severance benefits are available to designated employees who have been involuntarily terminated. Because the plan is an employee welfare benefit plan, it is governed by ERISA, 29 U.S.C. §§ 1001 et seq. Employees who voluntarily leave Crane are entitled to benefits only if they do so for "good reason," which the plan defines as certain changes to an employee's position, such as relocation, significant reduction in salary, or substantial changes to the employee's job responsibilities.[2] The plan reserves to the administrator — here, the compensation committee of Crane's board of directors — "full discretionary power and authority to construe, interpret and administer the Plan [and] to make Benefit Eligibility determinations." As a Crane executive, Niebauer was covered by the plan.

In his capacity as chief technology officer, Niebauer reported to the chief executive officer ("CEO") of the company — a position occupied, as of October 2011, by Stephen DeFalco, a recent hire. One of DeFalco's priorities upon taking office was repairing a frayed relationship with a significant client of the company, the

---

[2] Per the terms of the plan, an event constitutes "good reason" only if the employee provides written notice to the Crane's board of directors, specifying the event in question, within sixty days of the first occurrence of such event.

Bureau of Engraving and Printing ("BEP"), a division of the United States Department of the Treasury. Work on the latest BEP project, called "Type V," had stalled as a result of technological difficulties encountered in printing the paper used for $100 banknotes. To address the problems afflicting Type V, DeFalco launched a task force within Crane, referred to internally as "Project Momentum," and designated an employee named Rich Rowe as the project leader. As part of Project Momentum, DeFalco decided to station a Crane staff member at the BEP printing facility in Fort Worth, Texas, who would serve as the company representative and liaison to the Massachusetts headquarters.

On November 18, 2011, DeFalco asked Niebauer to serve as the Project Momentum deputy in Texas. Niebauer agreed, on the understanding that he was to be in Texas only to the end of the calendar year. However, after their conversation, DeFalco noted in an email to the BEP contact that Niebauer would "spend substantial time at [BEP] facilities until at least March [2012]." Niebauer began to have "second thoughts" about the length of the assignment, and also became concerned about personnel decisions that DeFalco had made in connection with Project Momentum, including his addition to the Massachusetts team of certain individuals whom Niebauer felt BEP distrusted.

Because of these concerns, Niebauer and DeFalco scheduled a phone call for November 22 to review the project's personnel and

the length of Niebauer's commitment. The two characterize this call differently. According to DeFalco, Niebauer effectively attempted to extract severance benefits in exchange for agreeing to the Texas assignment. According to Niebauer, he communicated to DeFalco that he believed that his new Project Momentum role constituted a triggering event under the severance plan, entitling him to benefits. In response, Niebauer says, DeFalco called this claim "crazy talk," stating that severance was awarded only if an executive was fired, and Niebauer was not being fired. Niebauer admits to telling DeFalco that he was in a position of "maximum leverage" vis-à-vis securing severance benefits. In any event, Niebauer ultimately recommitted to the Texas assignment.

Thereafter, team members worked to get Project Momentum up and running, and scheduled meetings with BEP representatives in Fort Worth for Monday, December 5. Niebauer, who had not yet relocated to Texas, was slated to make the trip. In an exchange with Rowe over the preceding weekend, however, Niebauer began to express reluctance to travel and eventually decided not to go. In a December 4 email to Rowe, Niebauer said that he had "made some decisions that [he] must inform [Rowe] of." Niebauer also emailed DeFalco on December 4, asking to set up a meeting "concern[ing] a decision [he] ha[d] reached."

The ensuing December 5 phone call between Niebauer and DeFalco is a focal point of this litigation; the parties vehemently

dispute the content and import of the conversation.  Niebauer's

account is that he called DeFalco on his cell phone and told him

that his persistent concerns about the structure of Project

Momentum left him no choice but to "at least consider retirement"

if the project organization did not change.[3]  At some point

thereafter, the parties agree that the call was dropped.  Niebauer

asserts that, when the connection was reestablished, DeFalco

rebuffed his offer to repeat what he had said; instead, DeFalco

declared that he had heard enough, and that it was his policy not

to try to talk an executive out of retirement.  According to

DeFalco, however, Niebauer told him that he was "retir[ing] now,

effective immediately," since he was not going to receive severance

at the conclusion of Project Momentum.  DeFalco told Niebauer that

he was disappointed but understood his decision to retire and

wished him well.

In the aftermath of the December 5 phone call, both

Niebauer and DeFalco sent emails to various individuals explaining

what had happened.  That afternoon, DeFalco emailed Charles

Kittredge, the former CEO of Crane who had stayed on as chairman of

the board, letting him know that Niebauer had just told DeFalco

that "he would be retiring immediately."  DeFalco also informed the

Project Momentum team by email the next day that Niebauer had

_____

[3] Niebauer testified at his deposition that the reason he gave
DeFalco for being forced to consider retirement was his failure to
negotiate a severance package.

decided to retire and that his last working day was likely to be December 16.

For his part, Niebauer emailed his daughter the morning after his conversation with DeFalco, telling her that he had "made the announcement to [DeFalco] that [he did] not want to go live in Fort Worth for the next six months and want[ed] to retire." On the afternoon of December 5, Niebauer also forwarded to DeFalco an email from a BEP contact who was trying to schedule a phone call. In forwarding the email, Niebauer asked DeFalco for guidance in responding to the BEP email, noting that he wanted "this to be a smooth transition but under[stood] if [DeFalco wanted] to make it more abrupt." Niebauer then forwarded the email chain to his wife, who replied, "Sounds like you told [DeFalco] that retirement is route."[4]

Following the December 5 call, DeFalco instructed Jay Wickliff, the head of human resources at Crane, to reach out to Niebauer to discuss next steps. Wickliff and Niebauer met on the morning of December 6. The parties' characterizations of this meeting diverge. Niebauer claims that he told Wickliff that he had not voluntarily retired but rather DeFalco had "retired him" — but that if he _were_ going to retire, he would need to learn more about

---

[4] As will be further discussed below, Niebauer's position in this litigation is that he never expressed an intent to retire, nor did he tell others that he had retired. Instead, he maintains on appeal that, after the December 5 call, he told people that DeFalco "had retired him."

his financial options. Crane asserts that Niebauer reiterated his decision to retire, and that he and Wickliff discussed setting a retirement date that took into account Niebauer's remaining vacation time. Wickliff emailed DeFalco after the meeting, stating, "[Niebauer] confirmed to me this morning his decision to retire." Wickliff added, "We discussed having some kind of event to honor his career. At first he thought he did not want to do anything, but decided that a low key event . . . would be best."

Later that day, DeFalco posted a message on Crane's internal communications system formally announcing the launch of Project Momentum. Niebauer's name was not included in the list of team members. Shortly thereafter, a colleague wrote in an email to Niebauer that he had just seen the announcement, which "said it all." In the ensuing back-and-forth, Niebauer wrote that he believed that his last day of work would be the next day, December 7, and that his "[r]etirement day [would] most likely be February 1st." Niebauer explained to the colleague that his "decision to leave was that in [his] opinion, the company [had] become dishonorable." Niebauer also emailed Rowe, the leader of Project Momentum, stating, "I am assuming that you know about my pending retirement,"[5] and that, since the announcement of the project team

---

[5] The copy of this typed email in the record bears handwritten quotation marks around "pending retirement."

had been posted without his name, he expected that he would not attend upcoming team meetings.

Also on December 6, Niebauer met with Rick Kendall, who handled retirement calculations for Crane's executives in conjunction with an outside firm, Towers Watson, which acted as Crane's actuarial consultant. Niebauer and Kendall discussed different options for retirement dates. Kendall advised that obtaining a retirement calculation from Towers Watson did not commit him to retiring, but that if he did retire, he would not be eligible for severance. In email correspondence through December 9, Niebauer asked Kendall to use February 1, 2012 as a basis for a retirement calculation, and then later proposed March 1, 2012 as his retirement date. Kendall then told Niebauer via email on December 9 that his last day of work would be January 27, 2012, followed by five weeks of vacation, for a retirement date of March 1. Shortly thereafter, Niebauer wrote in an email to his wife that they could "kiss the severance option good bye."

Beginning on December 12, Niebauer began unambiguously portraying his retirement as involuntary. When a coworker, Chris Duquette, emailed him that day to congratulate him on his retirement, Niebauer responded, "All I have agreed to is to consider retirement and look at the numbers to see if it is possible." Around that time, Niebauer also approached Wickliff (the head of human resources) to tell him that he had not decided

to retire and was not in fact retiring. Wickliff responded that Niebauer had indeed resigned,[6] and the CEO DeFalco had already accepted his resignation; if he wanted his job back, he would have to consult DeFalco.

DeFalco called Niebauer on December 16 to tell him that that day would be his last working day, but that he would be kept on the company payroll through the end of January. Wickliff sent Niebauer a letter to a similar effect, which Niebauer received on December 19. Following the phone call with DeFalco on December 16, Niebauer memorialized his disagreement in a letter, sent to DeFalco by certified mail, writing, "I have not resigned from Crane & Co. and . . . I have no present intention of resigning from Crane & Co. . . . [T]he termination of my employment at this point would be considered involuntary under the Executive Severance Plan." He claimed that this was all a misunderstanding arising out of the December 5 dropped call and that he had never communicated an intent to retire. Nonetheless, Crane shut off Niebauer's email and telephone access on December 16. Niebauer did not thereafter report to work.

Niebauer filed a claim for severance benefits under the plan on February 2, 2012, on the ground of involuntary termination. The compensation committee — the designated plan administrator,

---

[6] This opinion uses the terms "resign" and "retire" interchangeably, as the parties do in their briefing.

responsible for determining Niebauer's benefits eligibility — was scheduled to meet on March 15, 2012. In advance of the meeting, James Hackett, general counsel of Crane, investigated Niebauer's claim. He reviewed Niebauer's email correspondence around the time of his departure and spoke with various Crane employees about the circumstances leading up to the departure, including DeFalco, Wickliff, Rowe, Kendall, and Doug Crane, a Crane vice president. With the help of Wickliff and outside counsel, Hackett created a one-page timeline of events from November 2011 to February 2012 to summarize the results of his investigation.

At the compensation committee meeting, Hackett presented the timeline he had prepared.[7] Other documents before the committee included a copy of the plan, certain emails that Niebauer had sent in December of 2011,[8] and Niebauer's application for benefits.[9] DeFalco, Wickliff, and Kittredge also provided relevant information to the committee orally.[10]

---

[7] Niebauer did not attend the meeting, nor did he request to attend.

[8] Emails from Niebauer to Rich Rowe concerning travel plans to Texas, to his daughter, to Rick Kendall, and to Chris Duquette were not before the committee.

[9] At the time of Niebauer's departure from Crane, human resources had determined that he was ineligible for severance benefits under the plan and declined to pay them out. A summary of this decision was also before the compensation committee.

[10] Separately from Niebauer's claim for severance benefits, the committee also considered the issue of his "management incentive compensation," awarding him a lump sum of $3.5 million instead of

-11-

The committee issued a written summary of its decision on May 2, 2012, outlining the substance of Niebauer's claim, relevant plan provisions, and the information presented to the committee. Its conclusion was to deny Niebauer's claim for benefits, given that he had "voluntarily elected to resign his employment" and therefore "was not eligible for a severance benefit pursuant to the Plan." The written decision also noted that, pursuant to the terms of the plan, Niebauer was entitled to file an appeal within sixty days.

Although he had initially submitted his claim without supporting documentation, Niebauer's appeal of the adverse decision, filed on June 28, 2012, numbered almost seventy pages in length and contained a detailed rebuttal of Hackett's timeline and various appended emails and documents. Niebauer's position was that he had never announced an intent to retire, and that Crane's belief to the contrary was a misunderstanding; even though he had attempted to clear up the confusion, Crane did not allow him to maintain his employment.

In advance of the August 24, 2012 compensation committee meeting, members were provided with all of the documents that Niebauer had submitted in support of his appeal, in addition to a memorandum written by Hackett that included, among other things, an explanation of the legal authorities cited in Niebauer's appeal and

a payout over ten years.

copies of certain relevant emails, Hackett's timeline of events created for the first meeting, and the written summary of the initial decision to deny benefits.  At the meeting, the committee unanimously voted to deny Niebauer's appeal, on the ground that he had resigned his employment without "good reason" to do so, as defined in the plan.  The committee issued a written summary of its decision on September 7, 2012.

On October 30, 2012, Niebauer filed suit in the district court against Crane and the Crane executive severance plan.  His complaint sought to recover severance benefits allegedly due under the plan, 29 U.S.C. § 1132(a)(1)(B), and also pleaded one count of interference with a protected right.  Specifically, Niebauer alleged that Crane "terminated [his] employment [against his will] and then labeled it as a retirement in order to deprive him of severance pay and other benefits under the Plan," thereby discriminating against him for the purpose of interfering with a protected right, in violation of 29 U.S.C. § 1140.  In total, Niebauer sought $1,169,484 in damages, plus attorney's fees and costs.  That amount included $855,920 in severance benefits, $5000 for reimbursement of health insurance premiums, and $308,564 in back pay.

After ordering additional discovery to fill in gaps in the administrative record, the district court granted the defendants' motion for summary judgment.  The court held that the

committee's decision to deny Niebauer's claim for benefits was neither arbitrary nor capricious and was supported by substantial evidence. The court further held that because Niebauer could not establish that he had suffered an adverse employment action, he could not make out a prima facie case of interference with a protected right. This appeal followed.

## II. Analysis

On appeal, Niebauer argues that the compensation committee's decision to deny his claim for severance benefits was tainted by a conflict of interest as well as procedural errors, and was not supported by substantial evidence. He also asserts that the district court improperly granted summary judgment to the defendants on the interference claim. We address these issues in turn, but first discuss the applicable standard of review, which the parties dispute.

A. <u>Standard of review</u>

In general, where an ERISA plan delegates to the plan administrator the discretion to construe the plan and determine eligibility for benefits under its provisions, a decision made under the plan will be upheld unless it was "arbitrary, capricious, or an abuse of discretion." <u>Cusson</u> v. <u>Liberty Life Assurance Co. of Bos.</u>, 592 F.3d 215, 224 (1st Cir. 2010) (internal quotation marks omitted). Under this standard, a reviewing court "asks whether a plan administrator's determination is plausible in light

of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record."  Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 61 (1st Cir. 2013) (internal quotation marks omitted).  Because we review the district court's summary judgment decision de novo, we, too, apply a deferential standard to the plan administrator's decision.  Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002).

Niebauer argues against such deferential review by pointing out that the plan at issue is a "top hat plan" and urges us to follow the approach of the Third and Eighth Circuits, which have held that de novo review applies to decisions made under top hat plans.  See Craig v. Pillsbury Non-Qualified Pension Plan, 458 F.3d 748, 752 (8th Cir. 2006) (holding that "[t]op hat plans should be treated as unilateral contracts and reviewed in accordance with ordinary contract principles" (internal quotation marks omitted)); Goldstein v. Johnson & Johnson, 251 F.3d 433, 443 (3d Cir. 2001) (same); see also McCarthy v. Commerce Grp., Inc., 831 F. Supp. 2d 459, 480 (D. Mass. 2011) (noting circuit split regarding whether de novo or arbitrary and capricious standard of review applies to top hat plans generally).

Under ERISA, a top hat plan is "any 'plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management

or highly compensated employees.'" <u>Alexander</u> v. <u>Brigham & Women's Physicians Org., Inc.</u>, 513 F.3d 37, 42 (1st Cir. 2008) (quoting 29 U.S.C. § 1051(2)). The parties agree that the plan at issue is a top hat one.

We decline to decide whether top hat plans are categorically subject to de novo review because, as Crane observes, "[e]ven the Circuit courts that have reviewed top hat decisions under 'ordinary contract principles' . . . have noted that it is a distinction without a difference where, as here, the plan grants the administrator discretion to interpret the plan." Both the Third and Eighth Circuit cases upon which Niebauer relies ultimately reviewed decisions under top hat plans simply for reasonableness. <u>See</u> <u>Craig</u>, 458 F.3d at 752; <u>Goldstein</u>, 251 F.3d at 444. Those courts reasoned that a plan's grant of discretion to an administrator must be given effect as contract principles would ordinarily require: "where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith — a requirement that includes the duty to exercise the discretion reasonably." <u>Craig</u>, 458 F.3d at 752 (quoting <u>Goldstein</u>, 251 F.3d at 444). As "reasonableness is the basic touchstone in all benefit-denial cases," <u>Denmark</u> v. <u>Liberty Life Assurance Co. of Bos.</u>, 566 F.3d 1, 6 (1st Cir. 2009) (internal quotation marks omitted), we apply our typical deferential standard of review here.

In reliance on <u>Hannington</u> v. <u>Sun Life & Health Insurance</u>

-16-

Co., 711 F.3d 226, 230–32 (1st Cir. 2013), Niebauer argues in the alternative that de novo review is mandated under this Circuit's precedent where a plan administrator interprets material outside the plan. Niebauer maintains that the compensation committee here "interpreted emails and other documents to reach its conclusion." Those interpretations of non-plan documents, the argument goes, are not entitled to deference.

Hannington is inapposite. In that case, a plan administrator relied on a provision of the Veterans' Benefits Act to reduce the benefits due under a plan to a claimant, where that claimant was also receiving service-related disability compensation under the statute. 711 F.3d at 229, 231–32. We reviewed the plan administrator's construction of the statute de novo, holding that the administrator only had discretion to interpret the plan's provisions and that deference is inappropriate "when the plan fiduciary is required, in the course of determining the meaning of the plan language, to interpret material outside the plan." Id. at 230; see also Coffin v. Bowater Inc., 501 F.3d 80, 85 (1st Cir. 2007) (reviewing de novo plan administrator's interpretation of stock purchase agreement that allegedly terminated plan's obligations to subsidiary's workers after sale of subsidiary).

Here, by contrast, the non-plan material at issue is email correspondence, not documents creating or altering legal obligations such as statutes or contracts. The emails that the

compensation committee considered, wherein Niebauer discussed his retirement from Crane, do not bear on the legal definition of plan terms. Rather, they provide pertinent background, a basis for assessing whether the factual predicate of the plan's provisions has been triggered. Simple fact-gathering cannot displace the deference owed to a plan administrator. We thus proceed under the rubric of arbitrary-and-capricious review.

B. Conflict of interest

Niebauer argues that the compensation committee's decision to deny him benefits was irreparably tainted by a conflict of interest, pointing out that the existence of such a conflict is one factor that may justify the conclusion that a plan administrator's decision was arbitrary and capricious. See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 116-17 (2008); Denmark, 566 F.3d at 8. In particular, he asserts that the committee was biased by its concern with the ongoing problems plaguing the BEP contract and with Niebauer's integral role in ameliorating those problems, thus precluding it from impartially deciding Niebauer's claim for severance benefits. In other words, Niebauer maintains that the committee was so frustrated with the impending loss of the most important staff member (him) on Crane's most important project that it denied his claim for benefits to spite him.

This argument sits in tension with Niebauer's overall theory of the case. As the district court observed,

> [Niebauer] seems to suggest that his absence
> was going to damage [Project Momentum] and
> that Defendants wanted to penalize him because
> they were angry at his decision to leave the
> company at a sensitive time. [Niebauer] also
> strongly contends, however, that he never
> decided to leave, that Defendants knew he
> wanted to continue his employment, and that
> they nevertheless arbitrarily terminated him
> involuntarily, apparently despite the negative
> impact on the Project.

Niebauer, 44 F. Supp. 3d at 162. Thus, if it is true that the committee was so resentful of Niebauer's ill-timed departure that its judgment was impaired as to his severance claim, it is implausible that Crane would have terminated him in the first instance, as he claims.

But even leaving aside any internal inconsistency in his position, Niebauer does not identify an actual conflict of interest. The paradigmatic conflict of interest in ERISA cases occurs when the same entity is responsible for "both determin[ing] whether an employee is eligible for benefits and pay[ing] benefits out of its own pocket."[11] Glenn, 554 U.S. at 108. In such cases, the plan administrator's financial stake in the outcome acts as a disincentive to award benefits. Here, though, the success of Project Momentum in no way depended on the compensation committee's decision on Niebauer's claim for severance benefits. Whatever the

---

[11] Before the district court, Crane conceded the existence of such a structural conflict, albeit one that was de minimis in nature. Niebauer, however, does not press a structural-conflict argument on appeal.

committee members thought about the effect of Niebauer's departure on Project Momentum, the decision to award benefits would not impact the project either way. Rather than conflict of interest, Niebauer's argument on this score sounds in retaliation — a claim that he has also raised independently and that we address below.

C. Claimed procedural errors

We next turn to Niebauer's contention that the compensation committee's decision was procedurally flawed. He raises two arguments to buttress this claim: first, that the decision relied on an incomplete factual record, and second, that the committee's transmission of its decision to Niebauer failed to comply with ERISA's notice requirements, 29 U.S.C. § 1133. We address each in turn.

1.    Whether the committee's decision relied on an incomplete factual record

Niebauer faults the committee for relying on an "inaccurate and incomplete" record in rendering its decision. He points to two categories of errors that, in his view, undermine the legitimacy of the committee's final decision: first, he argues that the committee inappropriately relied on the one-sided timeline of events prepared by Hackett, the general counsel. He goes on to contend that Hackett "withheld" certain documents from the committee that supported Niebauer's position, such as various emails and personnel files.

We do not agree that there was anything improper in the content or scope of the materials that the committee considered. As an initial matter, it was entirely appropriate for the committee to rely on materials submitted by Crane; indeed, the plan contemplates that the committee will do just that, by making eligibility determinations "on the basis of information supplied to it by the Employer."  And while a plan administrator may not rely on evidence that it knows or has reason to know is misleading, Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 30 (1st Cir. 2005), that is not what happened here.  The timeline, far from being "undisputedly false," as Niebauer asserts, was a reasonable synthesis of a convoluted series of events, which hewed to the available evidence.  For example, although Niebauer claims that the timeline falsely represented that he agreed to a February 1, 2012 retirement date, that representation is a fair reading of a December 8, 2011 email to Rick Kendall on the topic of retirement calculations in which Niebauer wrote, "[I] think February 1st will work."

We also resist Niebauer's imputation of bad faith to Hackett in his management of the investigation.  Niebauer argues that Hackett kept certain records from the committee because they supported Niebauer's position.  In particular, Niebauer points to emails between him and Kendall about retirement calculations; emails between him and coworker Chris Duquette in which Niebauer

-21-

rebuffed congratulations on his retirement, stating that he had not actually retired; as well as a document in his personnel file which listed the reason for Niebauer's departure as "Retired — Involuntary."[12]  Hackett testified at his deposition that, in assembling materials for the committee to review, he "look[ed] for any e-mails that were relevant on the topic [of Niebauer's departure] in either direction," mindful of the committee's "fiduciary duties to get all the facts and to look at this thing in good faith."  Hackett stated that he turned over to the committee all emails, sent during the relevant time period, that he deemed relevant to Niebauer's claim.  Niebauer does not offer any reason to discredit this testimony.

Niebauer argues that, as a result of these supposed inaccuracies and omissions, the committee was under the mistaken impression that he had at least at one point decided to retire, before ultimately changing his mind.  But deposition testimony makes clear that the committee members understood that Niebauer's position was that he had not announced an intent to retire during the initial December 5 call with Stephen DeFalco.  In other words,

---

[12] An affidavit from the Crane benefits specialist who prepared the form, Gail Rondeau, demonstrates that the designation "Retired — Involuntary" was not intended to be an official pronouncement on the reason for Niebauer's departure from the company.  Rondeau averred that, in filling out the electronic form, she simply used the reason that Niebauer had provided, and that she "understood that the designation in the computer program was irrelevant for any purpose besides the Human Resources Department's administrative termination of Niebauer's enrollment in various benefits programs."

they understood that Hackett's timeline did not align with Niebauer's stance. Certainly, if they were not aware of Niebauer's position when the issue was considered at the first meeting, they were by the time they decided his appeal, which offered a "point-by-point refutation" of the timeline, Niebauer, 44 F. Supp. 3d at 158, and also provided copies of the allegedly withheld Kendall emails. It is this final decision that carries weight. Terry v. Bayer Corp., 145 F.3d 28, 35 (1st Cir. 1998).

Although Niebauer now argues that the appeal was necessarily incomplete because it was prepared once he no longer had access to his Crane email account, he noted at the time that he had intentionally presented his version of events in exhaustive detail so as to give the committee full context for his arguments. He does not now explain how the handful of documents that were unavailable to him at the time he filed his appeal would have materially strengthened his presentation of his position to the committee. As the district court concluded, "[t]he appeals process protected against potential bias on the part of Hackett by allowing [Niebauer] to present his unfiltered perspective to the Compensation Committee." Niebauer, 44 F. Supp. 3d at 165. Thus, even if the factual record undergirding the committee's initial decision was incomplete in some way, it was adequately supplemented by Niebauer's appeal.

2.      <u>Whether the committee complied with 29 U.S.C. § 1133</u>

Niebauer next argues that the committee failed to comply with ERISA's notice provision, which requires plan administrators to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1); <u>see</u> 29 C.F.R. § 2560.503-1 (setting forth implementing regulations). Plan beneficiaries whose claims have been denied are further entitled to "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). Relying on these provisions — in particular § 1133(1) — Niebauer argues that the notice of the compensation committee's final decision on his appeal was inadequate.

The notice requirements of ERISA are designed to "insure that when a claimant appeals a denial to the plan administrator, [he] will be able to address the determinative issues and have a fair chance to present [his] case." <u>DiGregorio</u> v. <u>Hartford Comprehensive Emp. Benefit Serv. Co.</u>, 423 F.3d 6, 14 (1st Cir. 2005) (quoting <u>Halpin</u> v. <u>W.W. Grainger, Inc.</u>, 962 F.2d 685, 689 (7th Cir. 1992)). This purpose is the lodestar in determining whether there has been substantial compliance with the notice provisions; strict compliance is not required. <u>See</u> <u>Terry</u>, 145 F.3d

-24-

at 39. In assessing a notice-based challenge, we ask whether "the beneficiary [was] supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." Id. (internal quotation marks omitted). A claimant typically must demonstrate that he or she has been prejudiced as a result of the notice's inadequacy. Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 240–41 (1st Cir. 2006).

Here, Niebauer complains that notice of the committee's final decision was inadequate because it failed to provide specific reasons. But although Niebauer claims that "[t]he entirety of the Committee's decision on the appeal [was] contained in two sentences," the two-page memorandum at issue in fact provided a procedural and factual background, in addition to a description of the relevant provisions of the plan and the information the committee considered in arriving at its decision, before summarizing its conclusion. At the end of the memo, the committee encapsulated its decision as follows:

> After considering and discussing the information presented, the Committee concluded that [Niebauer] had in fact elected to resign his employment rather than continue to work in support of the Crane & Co. project to which he had been assigned and further that his resignation was not for good reason as that term is described in the Severance Plan. See Article 2, Sections 2.10 and 2.16. Therefore [Niebauer's] appeal is denied.

This explanation, which clearly outlines the reason for the committee's decision, satisfies ERISA's notice requirements. See Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir. 2005) ("The denial letter need not detail every bit of information in the record . . . .").

In any event, the notice of the committee's initial decision, with which ERISA's notice provisions are primarily concerned, was adequate to permit effective review of Niebauer's claim. As Crane observes, it is undisputed that the key issue before the committee was whether Niebauer had resigned or instead had been involuntarily terminated. Niebauer was undeniably aware that this question was dispositive of his claim; indeed, after receiving notice of the committee's initial decision,[13] he submitted an appeal with seventy pages of supporting documentation, addressed to the precise issue of whether he had retired, or whether, in his parlance, he "was retired" against his will. After considering the documents that he submitted, the committee upheld its earlier decision on the same grounds. As such, Niebauer has no credible claim that his understanding of the issues at stake was so muddled as to inhibit effective review.[14] Compare Terry, 145 F.3d at 39

_____

[13] As discussed above, this notice advised Niebauer of the committee's conclusion that he, "a valued senior executive, had voluntarily elected to resign his employment, and that therefore he was not eligible for a severance benefit pursuant to the Plan."

[14] Niebauer also argues that the inadequacy of the notice is manifested in its incorrect reference to section 2.10 of the plan,

(where claimant submitted additional information to committee that directly addressed whether he was disabled from performing "any" job, "[h]is actions demonstrate[d] that he was well aware of the reasons for the decision, and was submitting additional evidence on the crucial point"), with Bard, 471 F.3d at 241 (where administrator provided no notice of denial, claimant was not "informed that he needed to show that his total disability occurred prior to termination of his employment, [and accordingly] submitted medical documentation not meant to address that point . . . which ultimately proved quite harmful to his administrative appeal").

D. Substantial evidence

As noted above, where the plan confers administrative and interpretive discretion upon the administrator, we review substantive challenges to decisions made under the plan for an abuse of discretion. Cusson, 592 F.3d at 224. To pass muster, administrators' determinations "must be reasoned and supported by substantial evidence." Colby, 705 F.3d at 62 (internal quotation marks omitted). "Evidence is deemed substantial when it is reasonably sufficient to support a conclusion." Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014) (internal

_____

which details the various "disqualifying event[s]" that constitute grounds for denying benefits. Even though section 2.10 is not at issue in this case, the errant citation to that provision does not undermine our conclusion that Niebauer — who received notice of the committtee's initial decision that referred to the proper sections of the plan— had a sufficiently clear understanding of the committee's position in order to permit effective review.

quotation marks omitted).  Thus, the question before us is not which side is right, but whether the compensation committee's decision to deny Niebauer's claim for severance benefits was reasonable on the record before it.  See id.

Niebauer would have us answer in the negative.  Essentially, his position is that the evidence demonstrates that he never expressed an intent to retire — on the December 5 call with DeFalco or otherwise.  Accordingly, he argues, his departure from Crane was the result of an involuntary termination, as evidenced by Crane's unilateral selection of his last day of work.  He contends that the committee failed to consider his position at all and instead accepted DeFalco's version of events uncritically.

Niebauer's claim that he never expressed an intent to retire is belied by the administrative record.  The committee had before it ample evidence that Niebauer announced his retirement to various parties on and around December 5, 2011.  In particular, even though there is no record of the disputed December 5 call, contemporaneous emails show that both DeFalco and Niebauer relayed to others that Niebauer decided to retire that day, effective immediately.  In the twenty-four hours after the call, both DeFalco and Niebauer independently confirmed the retirement announcement to various third parties; Niebauer's wife wrote in an email to him, "Sounds like you told [DeFalco] that retirement is route," and he later told her that "severance is very unlikely based on the

triggering events . . . . [I] think we kiss the severance option good bye."

Furthermore, there is substantial evidence that, beyond simply talking about the retirement, both parties took steps to effectuate Niebauer's stated intent after December 5. DeFalco left Niebauer's name off the announcement of the Project Momentum team, and Niebauer stopped attending team meetings thereafter. The committee considered evidence that Niebauer consulted with two different Crane employees about retirement logistics and also began discussing plans for a retirement party. He openly talked about his pending retirement with his coworkers and wife.

In the face of all this evidence, the committee was entitled to view Niebauer's belated disavowal of his retirement in the December 16 letter to DeFalco — eleven days after his initial announcement — as a specious attempt to collect severance. See Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 216 (1st Cir. 2004) (holding that it is within plan administrator's discretion to weigh competing evidence). This is particularly so where Niebauer's letter maintained that he had never resolved to retire, without acknowledging that his earlier conduct may have evinced a contrary intent.[15] And while Niebauer complains that the committee failed

_____

[15] We note that it is unclear from the record how a decision to retire is officially finalized at Crane. But we do not view this ambiguity as undercutting the substantial evidentiary grounds for the committee's decision, particularly where the committee considered evidence that Niebauer had announced his intent to

to consider his account of the December 5 dropped call, including his claim of miscommunication, the record reflects the opposite. As the chairman of the compensation committee testified at his deposition, "Certainly there was weight applied to the claim on Mr. Niebauer's part that there was some confusion, but the other evidence that we had . . . supported so much the retire[ment] decision that we credited it fairly significantly." The committee thus appropriately discharged its "responsibility . . . to weigh conflicting evidence." Vlass v. Raytheon Emps. Disability Trust, 244 F.3d 27, 32 (1st Cir. 2001).

Niebauer devotes significant attention to providing his perspective on the emails upon which the committee relied wherein he discussed his retirement with various people. For example, Niebauer asserts that the December 6 email to Rowe in which he mentioned his "pending retirement," "does not suggest that he in fact voluntarily retired," but simply reveals that he had been "specifically instructed to refer to it in that manner." But these alternative explanations cannot undermine the substantial evidentiary basis for the committee's decision that Niebauer had voluntarily retired and was thus ineligible for severance benefits. "[I]n the presence of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the

retire "effective immediately."

-30-

entity entitled to exercise its discretion," Gannon, 360 F.3d at 216, and we accordingly affirm the committee's decision here.

E.   Interference with protected rights

In the second count of his complaint, Niebauer has alleged that Crane impermissibly interfered with his protected rights under the plan, as proscribed by 29 U.S.C. § 1140. Specifically, Niebauer argues that "Crane involuntarily terminated [his] employment and then labeled it as retirement in order to deprive him of severance pay and other benefits under the Plan," even though he "repeatedly told Crane that he was not retiring and did not intend to retire."

The district court's analysis of this count relied on the "substantial evidence" standard applicable to assessing denial-of-benefits claims under ERISA.  The court held that

> Rule 56 cannot be used . . . to create an end run around the "substantial evidence" rule in an ERISA case.   Because Defendants' determination that he retired, and was not involuntarily terminated, was supported by substantial evidence, he cannot claim that he suffered an adverse employment action sufficient to support a claim under [29 U.S.C. § 1140].

Niebauer, 44 F. Supp. 3d at 168.

This ruling inappropriately conflates review of denial-of-benefits claims with review of interference claims.  In denial-of-benefits cases, "the ordinary question is whether the administrator's action on the record before him was unreasonable."

Liston v. UNUM Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003).  In such cases, "summary judgment is simply a vehicle for deciding the issue[, which] means the non-moving party is not entitled to the usual inferences in its favor."  Orndorf, 404 F.3d at 517.  In interference cases, by contrast, "the ultimate inquiry . . . is whether the employment action was taken with the specific intent of interfering with the employee's ERISA benefits."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995).  The court is thus reviewing an employer's conduct, rather than an administrator's decision, and as such, there is no administrative determination that commands deference.  Indeed, our cases have uniformly applied the typical summary judgment standard — under which evidence is reviewed in the light most favorable to the nonmoving party — in assessing interference claims.  See, e.g., Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 66-70 (1st Cir. 2008); Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327, 330-31 (1st Cir. 1996); Barbour, 63 F.3d at 36-42.  We therefore remand this count to the district court for consideration under the appropriate standard of review.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court as to Count I of the complaint.  We VACATE the judgment of the district court as to Count II of the complaint and

remand for proceedings consistent with this opinion.  No costs are

awarded.