# United States Court of Appeals
## For the First Circuit

No. 15-1923

BRIAN O'SHEA, through his Executor Michael O'Shea; MICHAEL
O'SHEA, in his personal capacity, on his own behalf as Plan
Beneficiary, and on behalf of other Plan Beneficiaries, Meghan
O'Shea, John O'Shea and Colleen O'Shea,

Plaintiffs, Appellants,

v.

UPS RETIREMENT PLAN; UNITED PARCEL SERVICE OF AMERICA, INC.;
UPS RETIREMENT PLAN ADMINISTRATIVE COMMITTEE,

Defendants, Appellees,

DOE DEFENDANTS 1, 2, AND 3,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before

Thompson, Circuit Judge,
Souter,* Associate Justice, and
Barron, Circuit Judge.

Stephen D. Rosenberg, with whom Caroline M. Fiore and The
Wagner Law Group were on brief, for appellants.
J. Timothy McDonald, with whom Megan S. Glowacki and Thompson
Hine LLP were on brief, for appellees.

---

* The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

September 13, 2016

**THOMPSON**, **Circuit Judge**.  This suit, arising under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq., presents the highly sympathetic case of a retiree whose death one week before his official retirement date, but after his final day of work, had the unexpected consequence of depriving his beneficiaries of ten years of payments under an annuity plan. Though we regret the heartbreaking outcome, after careful consideration, we must affirm.

## I.

We begin with the facts, which are not in dispute.  Brian O'Shea (O'Shea) worked for defendant-appellee United Parcel Service of America, Inc. (UPS) for 37 years.[1]  As an employee of UPS, he participated in the UPS Retirement Plan (Plan). Unfortunately, in 2008, O'Shea was diagnosed with cancer.  He became eligible for retirement in 2009, and decided to retire at the end of that year.

O'Shea met with a UPS human resources (HR) supervisor to discuss the logistics of his retirement in December 2009.  The HR supervisor informed him that he could maximize his time on payroll by taking his seven weeks of accrued vacation and personal time

---

[1] For ease, to refer to the defendants-appellees UPS, UPS Retirement Plan, and UPS Retirement Plan Administrative Committee collectively, we will use "UPS."

and, thus, delaying his official retirement date.[2]  It is standard practice apparently for UPS to advise its employees that they can redeem their vacation time before officially retiring. Regrettably, the HR supervisor was not aware at the time that O'Shea was terminally ill.[3]

O'Shea took the HR supervisor's advice.  He submitted his retirement application on January 7, 2010, his last day of work, and indicated that his annuity starting date[4] would be March 1, 2010, the day after his official retirement date of February 28, 2010.  He chose the "Single Life Annuity with 120-Month Guarantee" from a host of annuity payment plan options available under the Plan, and named his four children -- plaintiffs-appellants Michael O'Shea, Meghan O'Shea, John O'Shea, and Colleen O'Shea (collectively, the O'Sheas) -- as his beneficiaries.  Under his selected annuity, "a reduced benefit [would] be paid to [O'Shea] for his lifetime, with a guarantee of 120 monthly payments."

The application for retirement benefits, executed by O'Shea, provided, in pertinent part: "I will receive a monthly

---

[2] Before retirement, O'Shea's monthly salary was $7,800.00. His monthly annuity payments would have been $4,117.35.

[3] She did know that O'Shea was "in poor health," but apparently did not realize the "severity of his illness."

[4] The "Annuity Starting Date" is "the first day of the first period for which an amount is payable as an annuity."

- 4 -

benefit for my lifetime with a guarantee of monthly payments for a period of 10 years. If I die within the 10-year guarantee period, my beneficiar[ies] will continue to receive my monthly benefit amount for the remainder of the guarantee period." The section of the application where O'Shea listed his beneficiaries' information provided: "If you die before the guarantee period ends, your designated beneficiar[ies] will receive payments for the remainder of the guarantee period." Nowhere in the retirement benefits application, and at no point during his consultation with the HR supervisor, was it made explicit that surviving to the annuity starting date (i.e., March 1, 2010, the day after his official retirement date) was a prerequisite to the ten-year payment guarantee. It seems that O'Shea was therefore unaware he risked forfeiting the ten years of guaranteed payments to his beneficiaries by delaying his retirement date, especially while terminally ill.

The retirement benefits application did explain, however, that the summarized benefit plan designations would be paid "subject to the terms of the Plan." Section 5.4(d)(iii) of the Plan, which describes the "Single Life Annuity with 120-Payment Guarantee" selected by O'Shea, clarifies that "[i]f the Participant dies after the Annuity Starting Date but before receiving 120 monthly payments, the monthly payments shall be paid to the Participant's Beneficiary . . . ." (emphasis added). The

only provision of the Plan that explicitly provides for a retirement benefit if a participant dies prior to their annuity starting date is Section 5.6, which states: "If a vested Participant dies prior to his Annuity Starting Date, his Spouse or Domestic Partner will be entitled to receive a Preretirement Survivor Annuity . . . ."[5] (emphasis added).

After submitting his application for retirement benefits, O'Shea was invited to participate in UPS's Special Restructuring Program (SRP), which incentivized early retirement by offering one year's compensation to select employees in exchange for signing a release of claims and retiring. O'Shea met with his attorney on February 12, 2010. The same day, he accepted the SRP and executed the release of claims. In return, O'Shea received a single, pre-tax payment of $98,800.

The release, which is only a few paragraphs long, defined the "Released Parties" broadly as UPS and "all related companies," including "employee benefit programs (and the trustees, administrators, fiduciaries, and insurers of such programs)." The released claims included "all known and unknown claims, promises, [and] causes of action . . . that [O'Shea] may presently have . .

---

[5] In a section titled "If You Die Before You Retire," the Plan's summary plan description similarly provides: "If you die after you become vested in your Plan benefit but before your retirement benefit begins, your surviving spouse or surviving Domestic Partner . . . may receive a monthly benefit from the Plan."

. against any Released Party."  It did not bar claims that accrued after execution of the agreement.  But the release made clear that O'Shea was "releasing [c]laims that [he] may not know about."

O'Shea passed away on February 21, 2010, one week before his official retirement date, and eight days before his annuity starting date.  About a month later, defendant-appellee UPS Retirement Plan Administrative Committee (the Committee) -- the Plan's claims administrator -- sent the O'Sheas a letter denying them payments under the annuity plan.  The Committee explained that only O'Shea's spouse, if he had one, would be able to recover under the Plan.[6]

The O'Sheas appealed this decision, believing that the ten years of annuity payments were guaranteed to them regardless of when their father died.  In particular, they argued that nothing in the Plan "explains what happens if you select the 'Single Life Certain Annuity With 10-Year Payment Guarantee' . . . and you die before you retire (without a spouse or partner)."

The Committee denied the appeal on June 1, 2010.  Relying on Section 5.6 of the Plan, the denial letter explained that the annuity payments were only guaranteed if O'Shea survived to his

_____

[6] According to the O'Sheas' initial letter appealing UPS's denial of benefits, UPS had also called the O'Shea family in "early March" and explained that the O'Sheas "would not get [their father's] pension because he died while still an 'active' employee and did not, in fact, retire."

annuity starting date, and that O'Shea's death as an active UPS employee triggered the "Preretirement Survivor Annuity" (payable only to spouses or domestic partners) in lieu of the "Single Life Annuity with 120-Month Guarantee."[7]

The O'Sheas filed a second administrative appeal, this time with the help of counsel, arguing that UPS breached its fiduciary duty to their father. Specifically, the O'Sheas asserted that their father was talked into delaying his retirement date, that the consequences of the delay were not made clear to him, and that UPS had misrepresented to him that his payments were "guaranteed." On October 1, 2010, the Committee once again denied the appeal. This time the Committee highlighted language in the retirement application ("if I die within the 10-year guarantee period"), in addition to Section 5.6, noting that the application itself "clearly informed [] O'Shea that the only payments to beneficiaries were if he died within the 10-year guarantee period." The Committee also explained that any breach of fiduciary duty or misrepresentation claim had been released by their father when he decided to participate in UPS's SRP.

---

[7] Although O'Shea was single when he died, his ex-wife subsequently brought a claim for the "Preretirement Survivor Annuity" benefits pursuant to a Qualified Domestic Relations Order. UPS approved her claim, and she began receiving $315.05 a month under the "Preretirement Survivor Annuity" (as opposed to the $4,117.35 UPS would have paid monthly under the "Single Life Annuity with 120-Month Guarantee").

The O'Sheas then filed suit in district court, seeking recovery of the ten years of annuity payments allegedly "guaranteed" under the Plan. Their complaint included two counts: a claim for benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and a claim for equitable relief under ERISA § 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B). The equitable claim was based on alleged misrepresentations made to O'Shea when he selected his retirement benefits.

UPS first moved to dismiss the O'Sheas' equitable claim, arguing that the claim: (1) was barred by the release O'Shea executed under the terms of the SRP; (2) was barred by the statute of limitations for breach of fiduciary duty claims under ERISA, 29 U.S.C. § 1113(2); and (3) was precluded by the O'Sheas' ability "to avail themselves of other remedies." Ruling from the bench, the district court granted the motion, concluding that any alleged misrepresentations were made before O'Shea selected his retirement benefits and, therefore, any potential claim based on those misrepresentations would have been released under the terms of the SRP. Because it held that O'Shea had released his equitable claim, the district court did not address UPS's other arguments for dismissal.

The parties then cross-moved for judgment as a case stated[8] on the O'Sheas' remaining claim for benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). The district court ultimately granted UPS's motion for judgment, concluding that UPS's construction of the Plan terms was not only "plausible," but "correct" in light of the plain language of the Plan's terms. O'Shea v. UPS Ret. Plan, 115 F. Supp. 3d 138, 151 (D. Mass. 2015). The district court found Section 5.4 -- which describes the "Single Life Annuity with 120-Month Guarantee" selected by O'Shea and provides "that '[i]f the Participant dies after the Annuity Starting Date but before receiving 120 monthly payments, the monthly payments shall be paid to the Participant's Beneficiary," id. at 151 (quoting UPS Plan 62) -- to be "the most important provision of the Plan" and determined that the O'Sheas' reading of the Plan would render the first clause of Section 5.4 "useless." Id. Moreover, the district court found UPS's reading of Section 5.6, which provides for "Preretirement Survivor Annuity" payments

---

[8] Since the facts were not in dispute, the parties agreed to resolve the action at a case stated hearing. O'Shea v. UPS Ret. Plan, 115 F. Supp. 3d 138, 139 & n.1 (D. Mass. 2015) (explaining that "[a] case stated hearing is a procedure that allows the Court to make a judgment based on the record in cases where there are minimal factual disputes" and allows "the Court . . . to 'engage in a certain amount of factfinding, including the drawing of inferences'" (quoting TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007))).

to a participant's spouse or domestic partner, to be "[s]imilarly reasonable." Id. This appeal followed.

## II.

On appeal, the O'Sheas argue that UPS's interpretation of the Plan is arbitrary and capricious, and that the district court erred in concluding that UPS's reading of the Plan was correct. The O'Sheas also contend that the district court erred in dismissing their claim for equitable relief because, they argue, the claim "came into existence only after the release was executed" and O'Shea "did not intend knowingly and voluntarily to relinquish claims involving annuity payments."

### A. Claim for Benefits

Our review of the district court's decision is de novo. Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113, 125 (1st Cir. 2004). Where, as here, the ERISA plan provides the plan administrator with the authority and discretion to interpret the plan and to determine eligibility for benefits,[9] we must uphold the administrator's decision "unless it was 'arbitrary, capricious, or an abuse of discretion.'" Niebauer v. Crane & Co., 783 F.3d 914, 922-23 (1st Cir. 2015) (quoting Cusson v. Liberty Life Assurance Co. of Bos., 592 F.3d 215, 224 (1st Cir. 2010)).

---

[9] Section 9.3 of the Plan provides that the Committee "shall have the exclusive right to interpret the Plan and decide any matters arising in the administration and operation of the Plan" in a "conclusive and binding" capacity.

- 11 -

This analysis focuses on whether the record as a whole supports a finding that the plan administrator's decision was "plausible," "or, put another way, whether the decision is supported by substantial evidence in the record." Id. at 923.

Under this standard, we need not decide the "best reading" of the Plan. Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 94 (1st Cir. 2008) (quoting Lennon v. Metro. Life Ins. Co., 504 F.3d 617, 624 (6th Cir. 2007)). We need only consider whether UPS's interpretation of the Plan and its application of the Plan terms to the facts of this case was "reasoned and supported by substantial evidence."[10] Id. (quoting Wright v. R.R. Donnelley &

---

[10] As an initial matter, although the O'Sheas concede that the arbitrary and capricious standard of review applies to this case, they argue that the district court applied "an excessively broad and incorrect interpretation" of the standard. In general, they argue that the district court erred: (1) in applying a "plausibility" standard instead of considering whether the administrator's interpretation was "reasonable in light of the facts" and "comport[ed] with the actual language" of the Plan; (2) by "effectively ignor[ing] ambiguity in the Plan's terms"; and (3) by improperly reading an exclusion into the Plan in violation of our case law.

We think the O'Sheas largely misconstrue the district court's analysis. Far from depending on an "excessively broad" "plausibility" standard, the district court analyzed the Plan language and concluded that UPS's interpretation of the Plan was, in fact, "correct." O'Shea, 115 F. Supp. 3d at 151. Similarly, the district court did not "ignore" ambiguity in the Plan terms; it rejected the O'Sheas' arguments that the Plan was ambiguous, concluding that because it had already ruled that UPS's reading of the Plan was correct, the O'Sheas' ambiguity arguments "must fail." Id. Moreover, the district court considered, and rejected, the O'Sheas' argument that UPS's interpretation would improperly write an exclusion into the Plan, determining that O'Shea was not, in fact, excluded from coverage, but that he simply did not satisfy

<u>Sons Co. Group Benefits Plan</u>, 402 F.3d 67, 74 (1st Cir. 2005));

<u>see also</u> <u>Coffin</u> v. <u>Bowater Inc.</u>, 501 F.3d 80, 93, 96 (1st Cir. 2007) (reviewing the plan administrator's determination of benefit eligibility de novo and upholding its interpretation of the plan because its interpretation was "significantly more persuasive" than the plaintiffs' interpretation); <u>Kolling</u> v. <u>Am. Power Conversion Corp.</u>, 347 F.3d 11, 14 (1st Cir. 2003) (concluding that "the Plan administrator has the discretion reasonably to determine the meaning of [a] phrase [in the Plan]").

In denying the O'Sheas' claim for benefits, UPS explained that because O'Shea died while still an active employee (i.e., before his official retirement and subsequent annuity starting date), O'Shea's spouse, if he had one, would be the only person entitled to benefits under the terms of the Plan. And, in fact, Section 5.6, which provides for payments to a participant's spouse or domestic partner if the participant dies before the

a condition under the Plan that would allow him to receive the specific benefit he requested. <u>Id.</u> (noting that "what is happening in this case is not really an exclusion from coverage . . . . O'Shea was included within the scope of the Plan -- he just did not receive the benefit he wanted"). Because we conclude, however, that UPS's interpretation of the Plan is "'significantly more persuasive' than the interpretation offered by the [O'Sheas]," <u>D & H Therapy Assocs., LLC</u> v. <u>Boston Mut. Life Ins. Co.</u>, 640 F.3d 27, 36 (1st Cir. 2011) (quoting <u>Coffin</u> v. <u>Bowater Inc.</u>, 501 F.3d 80, 93, 96 (1st Cir. 2007)), we need not parse the exact contours of the district court's application of the standard of review, but will proceed directly to our consideration of whether UPS's interpretation of the Plan was arbitrary and capricious.

annuity starting date, is the only provision in the entire Plan that provides for a benefit when a participant dies <u>before</u> the annuity starting date.

The provision, cited by UPS in its denial letter, describes the "Preretirement Survivor Annuity" and provides that "<u>[i]f a vested Participant dies prior to his Annuity Starting Date</u>, his Spouse or Domestic Partner will be entitled to receive a Preretirement Survivor Annuity . . . ." (emphasis added). Section 5.6 does not state explicitly that the "Preretirement Survivor Annuity" is the exclusive benefit available if a participant dies before the annuity starting date. But because no other term in the Plan provides a benefit in that circumstance, UPS's interpretation -- that Section 5.6 provides the exclusive benefit when a participant dies <u>before</u> the annuity starting date -- is certainly within "the bounds of reasonableness." <u>D & H Therapy Assoc. LLC</u> v. <u>Boston Mut. Life Ins. Co.</u>, 640 F.3d 27, 38 (1st Cir. 2011).

In response, the O'Sheas argue that Section 5.6 does not reference the retirement benefit chosen by O'Shea -- the "Single Life Annuity with 120-Month Guarantee" -- and, therefore, Section 5.6 does not address "the possible ramifications if a participant elects that benefit but dies between . . . the retirement election

and . . . the first annuity payment."[11]  In the O'Sheas' view, Section 5.4 of the Plan, which describes the annuity selected by their father, guarantees ten years of monthly payments to the participant and his beneficiaries once the benefit is elected.[12] In support, the O'Sheas note that Section 5.4 does not directly state that the 120 months of payments will <u>not</u> be made if the participant dies before reaching the annuity starting date.  This is true.  Nevertheless, we read the plain language of Section 5.4 to comport with UPS's interpretation -- that Section 5.4 only guarantees ten years of payments if the participant survives to the annuity starting date.

The  "Single  Life  Annuity  with  120-Month  Guarantee" available under Section 5.4 of the Plan provides for a reduced monthly benefit for the participant's lifetime, with 120 monthly payments "guarantee[d]."  Section 5.4(d)(iii) explains that "<u>[i]f the Participant dies after the Annuity Starting Date</u> but before

---

[11] The O'Sheas also spend a substantial amount of time arguing that because Section 5.6 was mandated by Congress to protect the rights of surviving spouses, the section should be read narrowly. This argument is not persuasive.  Whether, or not, the language was required by Congress is irrelevant.  The section now appears in the Plan, and it provides the only benefit available when a participant dies before the annuity starting date.

[12] As UPS points out, under the O'Sheas' interpretation of the Plan, it is not entirely clear when benefits would become guaranteed: when the participant selects the benefit; when the necessary paperwork is submitted; or when the paperwork is accepted.

- 15 -

receiving 120 monthly payments, the monthly payments shall be paid to the Participant's Beneficiary, until the Participant and his Beneficiary have received a total of 120 payments." (emphasis added). This language clearly seems to suggest that Section 5.4 only guarantees monthly payments to the participant's beneficiaries when the participant dies after reaching the annuity state date and, consequently, appears to create a clear precondition to the "120-Month Guarantee" -- that the participant reach the annuity start date.

We agree with the district court that the O'Sheas' proposed interpretation of this section -- that it guarantees monthly payments to a participant's beneficiaries even if the participant dies prior to the annuity starting date -- "renders the first clause of this key phrase completely useless." O'Shea, 115 F. Supp. 3d at 151. The O'Sheas suggest that the phrase is included only "to reassure the reader that the payments to the participant and the beneficiaries will still total 120" even if the participant dies. But that interpretation still reads the words "after the Annuity Starting Date" out of the clause. If, as the O'Sheas argue, Section 5.4 guarantees all 120 payments to a participant's beneficiaries even if the participant dies before the annuity start date, the Plan would not need to specify that beneficiaries will receive the 120 payments "[i]f the Participant dies after the Annuity Starting Date." (emphasis added). It could

- 16 -

simply provide that if the participant dies before receiving 120 monthly payments, the monthly payments will be paid to the participant's beneficiary. It does not.

Reading Sections 5.4 and 5.6 together, then, we find UPS's interpretation of the Plan more than reasonable.[13] O'Shea's beneficiaries were eligible to receive either the "Single Life Annuity with 120-Month Guarantee" -- if O'Shea passed away after his annuity starting date -- or the "Preretirement Survivor Annuity" -- if he passed away before the annuity starting date and had a spouse or domestic partner. Because O'Shea tragically passed away before his annuity start date, UPS reasonably concluded that his spouse (or domestic partner) was entitled to the "Preretirement Survivor Annuity," but that his beneficiaries were not entitled to the "Single Life Annuity with 120-Month Guarantee."[14]

---

[13] Although not controlling, see CIGNA Corp. v. Amara, 563 U.S. 421, 438 (2011), contrary to the O'Sheas' arguments, the summary plan documents and the retirement benefits application also support UPS's interpretation of the Plan. The summary plan description provides, for example, "[i]f you die after you become vested in your Plan benefit but before your retirement benefit begins, your surviving spouse or surviving Domestic Partner . . . may receive a monthly benefit from the Plan." And the retirement benefits application provides that the participant "will receive a monthly benefit for [his] lifetime with a guarantee of monthly payments for a period of 10 years. If [he] die[s] within the 10-year guarantee period, [his] beneficiar[ies] will continue to receive [his] monthly benefit amount for the remainder of the guarantee period." (emphasis added).

[14] Because we find UPS's interpretation of the Plan language much more reasonable than the O'Sheas' interpretation, we need not consider the O'Sheas' arguments that the Plan is ambiguous (and how to construe the Plan in the face of ambiguity). See D & H

The O'Sheas attempt to blunt the impact of Section 5.4(d)(iii), arguing that because UPS did not rely on the section in its denial letters, we may not consider it now. See Niebauer, 783 F.3d at 926 (explaining that "ERISA's notice provision . . . requires plan administrators to 'provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant'" (quoting 29 U.S.C. § 1133(1))). But the purpose of ERISA's notice requirements is "to 'insure that when a claimant appeals a denial to the plan administrator, [he] will be able to address the determinative issues and have a fair chance to present [his] case.'" Id. at 927 (alterations in original) (quoting DiGregorio v. Hartford Comprehensive Emp. Benefit Serv. Co., 423 F.3d 6, 14 (1st Cir. 2005)). "[S]trict compliance is not required" so long as "'the beneficiary [was] supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review.'"    Id.

Therapy Assocs., LLC, 640 F.3d at 36 (noting that although we have never articulated precise guidelines for determining "when a plan administrator's construction will be sufficiently reasonable to warrant deference even though it is only as persuasive or less persuasive than the interpretation offered by the plaintiffs," we need not reach the issue when the plan administrator's construction is "'significantly more persuasive'" than that offered by the plaintiffs (quoting Coffin, 501 F.3d at 96)).

- 18 -

(second alteration in original) (quoting Terry v. Bayer Corp., 145 F.3d 28, 35 (1st Cir. 1998)).

Here, UPS consistently explained to the O'Sheas that they were not entitled to the 10-year monthly annuity payments because their father passed while he was an active (albeit on leave) employee and prior to his annuity starting date. In its initial denial, UPS cited to Section 5.6 to support its contention that because O'Shea had passed away prior to his annuity start date the "Preretirement Survivor Annuity" was triggered instead of the annuity payments. In addition, the final denial highlighted the retirement application's rephrasing of Section 5.4(d)(iii) -- "if I die within the 10-year guarantee period" -- to demonstrate why their father reasonably should have understood that his beneficiaries would only receive the annuity payments if he survived to the annuity starting date. Therefore, the O'Sheas were clearly on notice of UPS's position that the "Single Life Annuity with 120-Month Guarantee" was only available to a participant's beneficiaries if the participant died after reaching the annuity start date. Given that the O'Sheas have "no credible claim that [their] understanding of the issues at stake was so muddled as to inhibit effective review," we see no error in relying on Section 5.4(d)(iii) even though it was not cited by UPS in its denial letters. Niebauer, 783 F.3d at 928.

- 19 -

Finally, the O'Sheas argue that UPS's interpretation improperly incorporates "an unwritten exclusion of a benefit earned" into the Plan in violation of ERISA. We agree with the O'Sheas that UPS may not "carve[] out an exclusion from coverage that is nowhere expressed in the plan itself." Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 65 (1st Cir. 2013). But, as we have discussed in some detail, the condition that O'Shea had to survive until his annuity start date was "expressed in the plan itself." Id.

Moreover, we agree with the district court that UPS's interpretation of the Plan does not exclude O'Shea from coverage. See O'Shea, 115 F. Supp. 3d at 151 (noting that "what is happening in this case is not really an exclusion from coverage"). Rather, UPS determined that O'Shea simply did not satisfy a condition under the plan that would allow him to receive the benefit he requested. If O'Shea had lived past the annuity starting date, his beneficiaries would have been entitled to the 10-year guaranteed benefits payments. Unfortunately, O'Shea did not meet this mandatory precondition for coverage and, instead, his spouse or domestic partner was entitled to receive the "Preretirement Survivor Annuity."

### B.   Claim for Equitable Relief

The O'Sheas also argue that the district court erred in dismissing their claim for equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  They raise two related arguments:  (1) that the district court erred in concluding that their equitable claim was barred by the SRP release because the claim came into existence after their father agreed to the SRP; and (2) that because the claim came into existence after their father signed the release, he could not have "knowingly and voluntarily" waived the claim.  Although framed as two arguments, since both arguments rise and fall on the premise that their equitable claim did not arise until the annuity benefits were denied by UPS, we will address them both together.

We review the district court's grant of a Rule 12(b)(6) motion de novo, taking all factual allegations in the complaint as true and drawing all reasonable inferences in the non-moving party's favor.  <u>Guerra-Delgado</u> v. <u>Popular, Inc.</u>, 774 F.3d 776, 780 (1st Cir. 2014).  In order to survive a motion to dismiss, a complaint must contain sufficient factual material to state a facially plausible claim.  <u>Id.</u>

ERISA allows for the knowing and voluntary release of claims.  <u>Smart</u> v. <u>Gillette Co. Long-Term Disability Plan</u>, 70 F.3d 173, 181 (1st Cir. 1995).  "To determine whether a waiver is 'knowing and voluntary,'" we examine the totality of the

circumstances, including: (1) the employee's "education and business sophistication"; (2) the roles of the employer and employee in determining the terms of the release; (3) "the clarity of the agreement"; (4) the amount of time given to the employee to review the agreement; (5) whether the employee received independent advice (particularly the advice of counsel); and (6) the consideration paid in exchange for the release. Morais v. Cent. Beverage Corp. Union Empls.' Supplemental Ret. Plan, 167 F.3d 709, 713 & n.6 (1st Cir. 1999) (quoting Smart, 70 F.3d at 181).

The O'Sheas do not seem to attack the validity of the SRP release, and they concede that their father executed the release paperwork and agreed to relinquish "all known or unknown claims" in February 2010 -- approximately a month after he submitted his retirement application and two months after he met with UPS's HR supervisor.[15] They simply argue that their equitable claim arises from misrepresentations that did not become actionable "until after [their father] died, when UPS declined, solely due to [their father's] death, to pay the annuity." But, by their own account, the alleged misrepresentations occurred when

---

[15] We note that an examination of the relevant factors supports the conclusion that the release was made knowingly and voluntarily: the release is short and written in clear, simple language; O'Shea was given 45 days to review the agreement; he met with his counsel the same day he executed the agreement; and he was paid $98,800 in consideration.

O'Shea met with UPS's HR supervisor in December 2010 and when he received the Plan documents. In essence, then, they argue that even though the acts giving rise to the claim occurred before their father signed the release, the claim did not arise until they suffered monetary damages.[16] This argument conflates the breach and the remedy.

Under § 502(a)(3), a civil action may be brought "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). Here, the O'Sheas allege that their father was "misled" by UPS about the terms of the Plan and that the terms of the Summary Plan Description were unclear and deceptive. These events occurred (i.e., he was allegedly misled and provided with deficient Plan documents) when he met with UPS's HR supervisor to discuss the logistics of his retirement in December 2009. At that point, O'Shea could have sought equitable relief -- reformation, for example -- despite the fact that his beneficiaries had not yet been denied benefits.[17] Therefore, when

---

[16] Alternatively, the O'Sheas seem to imply that their equitable claim did not arise until they discovered the alleged misrepresentation. But because the SRP release explicitly covered all undiscovered claims, this argument goes nowhere.

[17] Monetary loss is not a necessary component of a claim for equitable relief under § 502(a)(3). See Amara v. CIGNA Corp., 775

- 23 -

their father executed the release in February 2010, any equitable claim based on alleged misrepresentations made to their father when he selected his retirement benefits was released.

Although we are sympathetic to the unfortunate and unexpected fallout resulting from his untimely death, we need go no further. O'Shea's claim for equitable relief existed when he signed the release, and is therefore barred.

**III.**

For the reasons articulated above, we affirm. Each side to bear its own costs.

---

F.3d 510, 513-14, 518-19, 525-26 n.12 (2d Cir. 2014) (implementing the Supreme Court's decision in Amara and affirming class certification for plaintiffs who showed "likely harm" resulting from an employer's inadequate plan summary).