# United States Court of Appeals
## For the First Circuit

No. 11-2270

JULIE COLBY,

Plaintiff, Appellee,

v.

UNION SECURITY INSURANCE COMPANY & MANAGEMENT
COMPANY FOR MERRIMACK ANESTHESIA ASSOCIATES
LONG TERM DISABILITY PLAN,

Defendant, Appellant.

ASSURANT EMPLOYEE BENEFITS; FORTIS BENEFITS INSURANCE COMPANY,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin,* Selya and Stahl,
Circuit Judges.

Joshua Bachrach, with whom Wilson, Elser, Moskowitz, Edelman & Dicker LLP was on brief, for appellant.
Mala M. Rafik, with whom Sean K. Collins, S. Stephen Rosenfeld, and M. Katherine Sullivan were on brief, for appellee.

---

*Judge Boudin heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion. The remaining two panelists have issued the opinion pursuant to 28 U.S.C. § 46(d).

January 17, 2013

**SELYA**, **Circuit Judge**.  This cutting-edge case involves the existence vel non of an obligation to pay long-term disability (LTD) benefits under a conventional group insurance plan.  The central question is whether, in an addiction context, a risk of relapse can be so significant as to constitute a current disability.  Although we recognize that our decision creates a circuit split, we answer this question affirmatively and uphold the district court's award of LTD benefits to the plaintiff.  In our view, a risk of relapse into substance dependence — like a risk of relapse into cardiac distress or a risk of relapse into orthopedic complications — can swell to so significant a level as to constitute a current disability.

## I.  BACKGROUND

Between 1988 and 2004, the plaintiff, Dr. Julie Colby, was a partner in a medical practice known as Merrimack Valley Anesthesia Associates (MVAA).  In that capacity, she served as a staff anesthesiologist at a hospital located in Newburyport, Massachusetts.  Her schedule was demanding: she worked 60 to 90 hours per week.

The landscape changed dramatically in July of 2004, when a colleague happened upon the plaintiff "sleeping or unconscious" on a table in the hospital.  The plaintiff tested positive for Fentanyl, an opioid used in her anesthesiology practice.  As

matters turned out, she had for some time been self-administering opioids and had become addicted.

The consequences of this discovery were stark: within a matter of weeks, the plaintiff took a leave of absence and entered inpatient substance abuse treatment at the Talbott Recovery Campus (Talbott) in Atlanta, Georgia. Talbott professionals diagnosed the plaintiff as having an opioid dependence, a dysthymic disorder, and obsessive-compulsive personality traits. In addition, her intake examination revealed severe back pain associated with degenerative disc disease and a history of major depression.

The plaintiff stayed at Talbott until November of 2004, after which she remained under regular medical supervision on an outpatient basis. For aught that appears, she has not resumed her use of Fentanyl. Her license to practice medicine was first relinquished, then revoked.

When the plaintiff's dependence on opioids came to light, her employer, MVAA, had in force a group employee benefit plan, underwritten and administered by Union Security Insurance Company & Management Company for Merrimack Anesthesia Associates Long Term Disability Plan (USIC), which included LTD benefits.[1] The plan is governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461.

---

[1] The parties variously refer to the paperwork undergirding the LTD benefits as "the plan" or "the policy." We use these terms interchangeably.

The plan had a 90-day waiting period (denominated as a "qualifying period") for LTD benefits. When the plaintiff applied for those benefits, USIC approved payment from the end of that period (November 8, 2004) to the end of her stay at Talbott (November 20, 2004). But USIC refused to pay benefits past this point. It noted that the plaintiff had been discharged from Talbott and that, although she remained under a doctor's care and feared a relapse, a "risk for relapse is not the same as a current disability."

The plaintiff exhausted her administrative appeals within the structure of the plan and then brought suit in the federal district court. See 29 U.S.C. § 1132(a)(1)(B). Her complaint named an array of defendants but, to all intents and purposes, USIC — the lone appellant — is the real party in interest. For ease in exposition, we refer to USIC as if it were the sole defendant.

In due course, the parties cross-moved for judgment on the record. Ruling on these cross-motions, the district court deemed USIC's termination of benefits unreasonable. Colby v. Assurant Emp. Benefits (Colby I), 603 F. Supp. 2d 223, 244 (D. Mass. 2009). Pertinently, the court stated that a denial of benefits premised on the ground that an "LTD plan does not cover future risk generally or treats physical and psychological future risks differently, absent language allowing such distinctions, is arbitrary and capricious." Id. The court remanded the matter for

further consideration "[b]ecause USIC [had] categorically excluded risk of relapse as a basis for disability" and thus had not "conducted the appropriate analysis, i.e. whether the probability of Dr. Colby relapsing upon a return to the practice of medicine was so high" that she was totally disabled under the plan. Id. at 246.

The remand had little practical effect. USIC's position hardened: it continued to resist the payment of any benefits beyond November 20, 2004, insisting that "[u]nder the terms of the applicable policy, risk of a potential future disability is not considered a current disability for which benefits are available."

The plaintiff again exhausted her administrative appeals and repaired to the district court. The district court reopened the case, and, responding to a new set of cross-motions for judgment on the record, awarded the plaintiff LTD benefits for the remainder of the 36 month period (the maximum available to her under the plan). Colby v. Assurant Emp. Benefits (Colby II), 818 F. Supp. 2d 365, 384 (D. Mass. 2011). In support, the court explained "that categorically excluding the risk of drug abuse relapse is an unreasonable interpretation of the Plan." Id. at 378. This timely appeal followed.

## II. ANALYSIS

The plan at issue here is conventional, and its contours are unremarkable. The baseline facts are pellucid: the plan falls

within the compass of ERISA, USIC is the plan administrator, and the plan documents vest discretion in the plan administrator with respect to both the interpretation and application of the plan's provisions. Refined to bare essence, this appeal poses only a single question: whether, under the plan, USIC exercised its discretion reasonably in terminating the plaintiff's benefits on the ground that risk of relapse cannot constitute a present disability.

We approach this question with an understanding that our review is deferential. Where, as here, the administrator of an ERISA plan is imbued with discretion in the interpretation and application of plan provisions, its use of that discretion must be accorded deference. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). It follows that judicial review is for abuse of discretion. See Conkright v. Frommert, 130 S. Ct. 1640, 1646 (2010); Firestone Tire, 489 U.S. at 115.

In the ERISA context, this metric is equivalent to the familiar arbitrary and capricious standard. D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 & n.5 (1st Cir. 2011); Cook v. Liberty Life Assur. Co., 320 F.3d 11, 17 n.7 (1st Cir. 2003). Whatever label is applied, the relevant standard asks whether a plan administrator's determination "is plausible in light of the record as a whole, or, put another way, whether the decision

is supported by substantial evidence in the record." Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002) (citations omitted).[2]

Even though this standard of review is deferential, we hasten to add that there is a sharp distinction between deferential review and no review at all. "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits." Conkright, 130 S. Ct. at 1651. In order to withstand scrutiny, the plan administrator's determinations must be "reasoned and supported by substantial evidence." D & H Therapy, 640 F.3d at 35 (internal quotation marks omitted). In short, they must be reasonable. See Conkright, 130 S. Ct. at 1651.

In some cases, an inherent conflict of interest exists; that is, the plan administrator (typically, an insurer) not only evaluates claims but also underwrites the plan. USIC has such a dual role here. See Colby II, 818 F. Supp. 2d at 377; Colby I, 603 F. Supp. 2d at 236. This inherent conflict may be weighed as a factor in assessing the reasonableness of USIC's decision, but its existence does not perforce alter our standard of review. See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115, 117 (2008).

---

[2] Where applicable, the abuse of discretion standard binds all reviewing courts, whether district or appellate, in the evaluation of a plan administrator's determinations. Accordingly, we review de novo the district court's own assessment of USIC's decision. See Leahy, 315 F.3d at 17-18.

Against this backdrop, we turn to the plaintiff's claim.[3] The case for coverage is straightforward. The plan contains an "occupation test." The scope of coverage under the occupation test is set out in simple terms. The plan covers an "<u>injury</u>" or "<u>sickness</u>" that requires a claimant to "be under the <u>regular care and attendance</u> of a <u>doctor</u>, and prevents [her] from performing at least one of the <u>material duties</u> of [her] <u>regular occupation</u>" (emphasis in original). Coverage pursuant to this metric applies to the first 36 months of a period of disability, subsequent to a 90-day waiting period.[4]

For purposes of this test, the plaintiff's "regular occupation" is that of "physician." The issue in this case, therefore, relates to the plaintiff's ability to work as a physician. See Colby I, 603 F. Supp. 2d at 237-38. Under the plan, the material duties of that position include working full-time (at least 45 hours per week), reviewing and evaluating medical records, diagnosing patients' medical conditions, "[e]xpress[ing]

---

[3] In our review of this matter, we focus on opioid dependence. Although the plaintiff's application for LTD benefits cited a number of grounds in addition to opioid dependence, the district court rejected these other grounds. The plaintiff has not challenged this ruling.

[4] The district court found the plaintiff ineligible for LTD benefits past this 36-month span pursuant to the policy's "Any Gainful Occupation" test. See Colby II, 818 F. Supp. 2d at 384. The plaintiff has not challenged this finding on appeal.

an opinion on or prescrib[ing], diagnostic measures and treatment," and recording and reporting facts and findings.[5]

The definitions contained in the plan make clear that substance abuse, dependence, and addiction — like mental illness more generally — are conditions that may give rise to "sickness" within the purview of the plan. The plaintiff says that during the relevant period she suffered from opioid dependence and addiction, remained under the regular care of a series of doctors, and faced such a significant risk of relapse that she could not perform one or more of the material duties of her customary occupation. This risk of relapse was particularly acute because returning to work as a physician would afford her easy access to opioids and other addictive substances.

Although there is evidence pointing in different directions, the record generally suggests that the plaintiff was at a high risk of relapse into opioid dependence following her discharge from inpatient care.[6] Her attending physician at Talbott

---

[5] Although USIC says that anesthesiologists, as compared to physicians generally, have an increased exposure to opioids, its initial motion for judgment on the record asserted that "any difference between job classification really does not matter" because "risk of relapse . . . is not a proper basis for a disability claim." Its later motion did not back away from this assertion. Thus, we need not inquire into the effect of the differing levels of opioid temptation (if any) between anesthesiologists and other physicians.

[6] The district court repeatedly used the phrase "substance abuse." See, e.g., Colby II, 818 F. Supp. 2d at 369; Colby I, 603 F. Supp. 2d at 226, 238. USIC seizes upon this awkward locution,

recommended that she should "not return to the practice of medicine for six months to allow her to continue to work on her recovery." The plaintiff followed this advice and entered into a three-year contract with Physician Health Services (PHS),[7] which required her, among other things, to abstain from alcohol and drugs, submit to random urine screens, meet with a therapist (once or twice per month), attend a weekly support group, and submit to monitoring by a physician.

The plaintiff's risk of relapse was not merely theoretical. In perhaps the most striking actualization of this risk, the plaintiff was arrested in May of 2005 — some six months after her departure from Talbott — for driving under the influence of alcohol. This incident constituted a relapse within the parameters of her PHS contract and precipitated the execution of a new contract (which restarted the three-year clock).

directing our attention to the difference between substance abuse and substance dependence. We agree that substance abuse and substance dependence are distinct conditions, see Diagnostic & Statistical Manual of Mental Disorders 191-99 (4th ed., text rev. 2000), but any error in this regard was harmless. A diagnosis of substance dependence necessarily preempts a diagnosis of substance abuse, id. at 198, and the record makes manifest that the plaintiff was appropriately diagnosed with the former condition.

[7] According to its website, PHS "is a non-profit corporation founded by the [Massachusetts Medical Society] that provides confidential consultation and support to physicians, residents and medical students facing health concerns related to: Alcoholism[,] Substance abuse[,] Behavioral or mental health issues[, and] Physical illness."

Here, moreover, the plaintiff's opioid dependence did not exist in a vacuum; instead, it was part of a constellation of factors, including back pain and various mental health disorders. See Colby I, 603 F. Supp. 2d at 238. Copious evidence, including statements by her therapist, Patricia Dell-Ross, linked her opioid dependence to her back pain, her turbulent personal life, and the stresses of her job.[8] Her professed inability to return to work thus contemplated not only enhanced physical and logistical exposure to her drug of choice but also the likely exacerbation of other triggering conditions. Cognizant of this nearly perfect storm, Dell-Ross, in a letter dated January 30, 2007, predicted that, should the plaintiff return to work, her "access to opiates, . . . combined with the usual and unusual stressors of everyday life and work would make her relapse almost inevitable."

The record reflects that, due largely to the risk of relapse, a number of medical experts agreed that the plaintiff remained disabled for at least some period of time following her discharge from Talbott. On November 1, 2005, Dr. Alan A. Wartenberg wrote that "to a reasonable degree of medical certainty, [] Dr. Colby is at high risk of relapse should she return to the

---

[8] The term "turbulent personal life" is hardly an overstatement. For example, during the 2005-2007 time frame, the plaintiff's mother-in-law (with whom she was close) died of cancer; her mother drowned in a hotel bathtub; and her abusive ex-husband, after attempting to interfere with her custody of their twin daughters, died of a heroin overdose.

-12-

practice of anesthesia, or to any situation where she could access anesthetic opioids." The plaintiff, he added, "appears to still be in significant denial and minimizes the level of her dependency and the dangers associated with her drug use." In the same vein, Dr. Marcus J. Goldman wrote that the plaintiff had psychiatric functional incapacity from July 2004 through the end of 2005 and that her "risk of relapse . . . was significant." As such, "she could not work from July 2004 through to December 2005." So, too, Dr. William B. Land wrote that the plaintiff's "combination of [] psychiatric and physical conditions [including opioid dependence] rendered her unable to perform the duties not only of an anesthesiologist, but also for a physician generally given the access to opio[i]ds" during the period from July of 2004 through the last date for which Dr. Land had access to the plaintiff's medical records (December of 2007). He noted that the plaintiff "appeared to have numerous psychosocial stressors which would have precipitated a relapse," including "severe and disabling back pain." Working full-time, he explained, "would clearly increase [the plaintiff's] risk of relapse," and "[h]er strong attraction to her drug of choice (Fentanyl) would distract her and preclude her from conducting her essential duties."

A number of allied professionals agreed with these assessments. For example, Dr. Milton Jay, Ed.D., wrote that the plaintiff had a "moderate severity relapse risk profile" such that

she did not have "functional capacity for returning to work" until June of 2006. Factors increasing her risk of relapse included denial of her dependence; relapse to alcohol; an obsessive-compulsive personality trait; and a history of major depression, dysthymia, and post-traumatic stress disorder.

The overwhelming weight of this evidence indicates that the plaintiff was, at least for some appreciable time after leaving Talbott, at a very significant risk of relapse. It might have been possible for USIC to limit the period of disability by arguing that this risk progressively diminished over the 36-month period. But USIC eschewed this possibility before the district court. It took a categorical approach, steadfastly maintaining that risk of relapse, whatever the degree, could not constitute a current disability under the plan. For example, its initial motion for judgment on the record posited that "a mere risk of relapse into a prior, self-controlled condition is not . . . [a] condition that would preclude the plaintiff from working in her occupation."[9]

Even after the district court remanded for the specific purpose of allowing USIC to find the facts relating to the significance of the risk of relapse over time, see Colby I, 603 F.

---

[9] To be sure, USIC observed at one point that the plaintiff had failed to establish a "significant probability of relapse." This observation, however, was little more than a throwaway, unaccompanied by any attempt at either differential factfinding or developed argumentation. We therefore regard the observation as secondary to USIC's categorical approach.

Supp. 2d at 246-47, USIC stuck to its guns. While it collected some additional medical evidence, it continued to view that evidence through the prism of its insistence that a risk of relapse, no matter how grave, could not constitute a current disability.

On appeal, USIC reiterates this single-minded insistence but couches its argument in somewhat different phraseology. It says that the plaintiff did not provide "objective proof" of a disability and cites Boardman v. Prudential Insurance Co., 337 F.3d 9 (1st Cir. 2003), for the proposition that, when such objective proof is lacking, a denial of benefits is not an abuse of discretion, see id. at 16-17 n.5. But this change in phraseology does not herald a change in substance. Cf. William Shakespeare, Romeo and Juliet act 2, sc. 2 (1595) ("[T]hat which we call a rose [b]y any other name would smell as sweet[.]"). USIC collapsed this "objective proof" argument on itself when it noted that no such objective proof could exist because the plaintiff "admittedly was not actively addicted on or after November 20, 2004." Appellant's Br. at 26. USIC then reaffirmed its categorical approach asserting that, "a doctor's opinion that there is a high probability of relapse is not objective or even reliable evidence of a current disability." Appellant's Reply Br. at 13. So viewed, USIC's defense remains the same as the one that it offered in the district

court: that a risk of relapse, even if significant, cannot ground a claim for LTD benefits under the policy.

We readily acknowledge that the caselaw is mixed as to the viability of such a defense. Compare, e.g., Stanford v. Cont'l Cas. Co., 514 F.3d 354, 360 (4th Cir. 2008) (upholding insurer's denial of LTD benefits to Fentanyl-addicted nurse anesthetist), with, e.g., Kufner v. Jefferson Pilot Fin. Ins. Co., 595 F. Supp. 2d 785, 787-88 (W.D. Mich. 2009) (overturning insurer's denial of continuing LTD benefits to opioid- and alcohol-dependent anesthesiologist). We conclude that the defense is not viable in this case: given the language of the plan, categorically excluding risk of relapse as a source of disability is simply unreasonable.

To begin, the language of the plan admits of no such categorical bar. It does not mention risk of relapse, let alone exclude risk of relapse as a potential basis for a finding of disability. This silence is telling in an ERISA case because the discretion of a plan administrator is cabined by the text of the plan and the plain meaning of the words used. See Harris v. Harv. Pilgrim Health Care, Inc., 208 F.3d 274, 277-78 (1st Cir. 2000) (explaining that "the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning" (internal quotation marks omitted)). Plucking an exclusion for risk of relapse out of thin air would undermine the integrity of an ERISA plan.

-16-

In an effort to turn dross into gold, USIC suggests that the plain meaning rule actually operates in its favor. It emphasizes that the plan's language is crafted in the present indicative tense: a claimant is disabled if a sickness "prevents" her from performing one of the material duties of her regular occupation. Because a risk of relapse is a speculative future possibility, USIC's thesis runs, the use of this present indicative verb perforce excludes risk of relapse.

This alchemy is clever but unavailing. Its primordial flaw is that USIC has persistently refused to consider whether the plaintiff was presently disabled through risk of relapse. Rather, it has assumed that she could not be disabled after her release from Talbott because she was not still experiencing the effects of opioid dependence. This assumption carves out an exclusion from coverage that is nowhere expressed in the plan itself. In an ERISA plan, exclusions from coverage are not favored, cf. B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 39 (1st Cir. 2004) (explaining that, under Massachusetts law, any ambiguity in an insurance policy exclusion "must be construed strictly against the insurer"), and the employer (or an insurance company that stands in the employer's shoes) must spell out exclusions distinctly. Importing into an ERISA plan an unwritten proviso categorically excluding risk of relapse as a basis for disability undercuts a plan administrator's "higher-than-marketplace quality"

-17-

obligation to use its discretion to process claims "'solely in the interests of the participants and beneficiaries' of the plan." Glenn, 554 U.S. at 115 (quoting 29 U.S.C. § 1104(a)(1)); see Kufner, 595 F. Supp. 2d at 796-97.

Here, moreover, there is no principled basis for implying the exclusion that USIC seeks to read into the plan. The provisions of an ERISA plan must be read in a natural, commonsense way. See Harris, 208 F.3d at 277-78; Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 586 (1st Cir. 1993). We think it is a commonsense proposition that a substance-dependent individual's risk of relapse can swell to a critical mass of disability. See Price v. Disability RMS, No. 06-10251, 2008 WL 763255, at *17 & n.2, *21 (D. Mass. Mar. 21, 2008) (recognizing, in a case in which a urologist was claiming LTD benefits, that a risk of relapse into substance abuse might be so significant as to warrant a finding of total disability). The unwritten textual exclusion that USIC advocates flies in the teeth of this commonsense proposition.

The argument for an unwritten textual exclusion is especially weak because risk of relapse is not a concept peculiar to the realm of substance abuse and dependence. It is a critical aspect of many types of physical and mental disability. See, e.g., Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 391-92 & n.12 (3d Cir. 2003) (finding arbitrary and capricious insurer's denial of LTD benefits to orthopedic surgeon at risk of additional

-18-

heart attacks). For example, an air traffic controller with a seizure disorder may be totally disabled with respect to her regular occupation because the radar illumination and the runway's flickering lights put her at grave risk of convulsive episodes. It is not that she is physically unable to go through the motions required by an air traffic controller's job but, rather, that her risk of relapse is prohibitively impairing and thus becomes, for all practical purposes, a current disability.

Our conclusion that there is no basis for importing an unwritten textual exclusion for risk of relapse into the plan finds solid support in Judge Wilkinson's dissenting opinion in Stanford. That case involved a very similar situation: the claimant, a nurse anesthetist, suffered from substance addiction to Fentanyl, and LTD benefits were initially paid. Stanford, 514 F.3d at 355-56. Eventually, however, the parties quarreled over whether the claimant actually had to undergo a relapse in order to maintain his entitlement to benefits. See id. at 359. The panel majority said that he did. Id. Judge Wilkinson disagreed; in his view, requiring the claimant either "to relapse into addiction or lose his benefits would [] thwart the very purpose for which disability plans exist: to help people overcome medical adversity if possible, and otherwise to cope with it." Id. at 362 (Wilkinson, J., dissenting).

USIC's denial of LTD benefits is unreasonable in yet another way: it creates a perverse incentive. Declaring the plaintiff fit for her usual occupation immediately upon her release from Talbott would, if the plaintiff acted in accordance with that declaration, not only put her at risk but also threaten to endanger her patients. As another court stated in an analogous case, denying benefits to an anesthesiologist "unless and until . . . an actual relapse of [] narcotics addiction [occurs] . . . is untenable given the serious risk this poses to public health and safety." Kufner, 595 F. Supp. 2d at 796. The court below recognized this danger, see Colby I, 603 F. Supp. 2d at 243-44, and so do we.

Let us be perfectly clear. Our holding today is narrow. It pivots on a fusion of the plain language of the plan and USIC's all-or-nothing approach to its benefits determination. USIC could have written into the plan an exclusion for risk of relapse, but it did not choose to do so. Without such a written exclusion in place, we believe that USIC acted arbitrarily and capriciously in refusing to consider whether the plaintiff's risk of relapse swelled to the level of a disability. A benefits determination cannot be "reasoned" when the plan administrator sidesteps the central inquiry.[10]

---

[10] The district court painted with a much broader brush, holding that USIC had unlawfully discriminated between physical and mental conditions. See Colby II, 818 F. Supp. 2d at 378-79. We

We are keenly aware that the only court of appeals to have considered this precise issue has — albeit in a two-to-one decision — reached a contrary conclusion. See Stanford, 514 F.3d 354. We do not cavalierly part company with a sister circuit. When all is said and done, however, we have "an obligation to engage independently in reasoned analysis," In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1176 (D.C. Cir. 1987); and here, the desire to achieve uniformity must give way to the need to ensure that plan administrators handle claims reasonably.

There is one loose end with respect to coverage. The plan provides, in part, that if a claimant "can perform the material duties of [her] regular occupation with reasonable accommodation(s)," she "will not be considered disabled" (emphasis in original). In a letter to the plaintiff dated March 25, 2010, USIC for the first time suggested that it would have been "a reasonable work accommodation" for another healthcare professional to monitor and supervise the plaintiff's exposure to opioids, thus permitting the plaintiff to return to work. This suggestion came too late.

USIC denied continuing LTD benefits to the plaintiff in July of 2005. At that point, less than one-quarter of the 36-month benefit period had elapsed. USIC, however, did not mention a possible accommodation until more than four years later. In the

take no view of this reasoning.

-21-

interim, the district court had decided Colby I and remanded to the plan administrator for reconsideration of a specific point. Having failed to suggest the accommodation at a time when it might have forestalled the accrual of benefits and allowed the plaintiff to return to work, USIC cannot raise the reasonable accommodation defense now.[11] Cf. Valle-Arce v. P.R. Ports Auth., 651 F.3d 190, 200 (1st Cir. 2011) (explaining that employer's unwarranted "delay may amount to a failure to provide reasonable accommodations" under Americans with Disabilities Act); Glista v. Unum Life Ins. Co., 378 F.3d 113, 128-32 (1st Cir. 2004) (barring insurer from relying on particular basis for denying LTD benefits that was not communicated to claimant during internal review process).

This leaves the question of remediation. The district court awarded the plaintiff "retroactive LTD benefits for the initial thirty-six month period of her disability, less any benefits already received." Colby II, 818 F. Supp. 2d at 384. USIC questions this remedial order. Our review is for abuse of discretion. Cook, 320 F.3d at 24.

A district court enjoys considerable latitude in the selection of a remedy in an ERISA case. Buffonge v. Prudential Ins. Co., 426 F.3d 20, 31 (1st Cir. 2005); Cook, 320 F.3d at 24.

_____

[11] The district court precluded USIC from raising its proposed reasonable accommodation on the ground that USIC did not comply with its internal guidelines regarding the vetting of such accommodations. See Colby II, 818 F. Supp. 2d at 383. We do not reach this issue.

The retroactive reinstatement of benefits is often an appropriate outcome. <u>See</u>, <u>e.g.</u>, <u>Cook</u>, 320 F.3d at 24. Sometimes, however, it may be more appropriate for the court to defer to the plan administrator and remand for further proceedings. <u>See</u>, <u>e.g.</u>, <u>Buffonge</u>, 426 F.3d at 31-32. The choice of remedy depends on the circumstances of the particular case.

In this instance, the district court did not abuse its discretion in awarding retroactive benefits. It already had remanded the case once, to no avail. While a court should be respectful of a plan administrator's prerogatives, it is not obliged to make an endless series of remands. <u>Cf.</u> <u>Cook</u>, 320 F.3d at 24 (explaining that "the variety of situations is so great as to justify considerable discretion on the part of the district court" in deciding between remand and retroactive reinstatement of benefits). Here, the court afforded USIC an opportunity to cure the defects in its original determination. Given that USIC squandered that opportunity, we cannot fault the court's subsequent decision to take the bull by the horns and bring this long-festering matter to a conclusion.

The amount of benefits scarcely can be questioned. On this record, awarding a full 36 months of benefits flowed naturally from USIC's all-or-nothing defense of the case. USIC has consistently sought to construct a dichotomy, insisting that the plaintiff was disabled while she was actively abusing Fentanyl and

receiving inpatient care, but not disabled thereafter.  In light of USIC's unfounded position and the medical evidence showing a significant risk of relapse, we cannot say that the district court abused its discretion in awarding a full 36 months of LTD benefits.

There is one more leg to our journey.  The district court awarded the plaintiff attorneys' fees (including costs) because she prevailed on her ERISA claim.  See Colby II, 818 F. Supp. 2d at 385; Colby I, 603 F. Supp. 2d at 246-47; see also Colby v. Assurant Emp. Benefits, 635 F. Supp. 2d 88, 100 (D. Mass. 2009) (quantifying interim fee award).  USIC contests the fee award.

By statute, the district court has discretion to award attorneys' fees to a prevailing plaintiff in an ERISA benefit-denial case.  See 29 U.S.C. § 1132(g)(1).  USIC's disagreement with the fee award is premised exclusively on its insistence that the underlying award of benefits was arbitrary and capricious.  Because we have upheld the underlying benefits determination, see text supra, we reject USIC's challenge to the fees.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we uphold the judgment of the district court.

**Affirmed**.