# United States Court of Appeals
## For the First Circuit

No. 24-1598

STEVEN BERNITZ,

Plaintiff, Appellant,

v.

USABLE LIFE; FULLSCOPE RMS f/k/a DISABILITY REINSURANCE
MANAGEMENT SERVICES,

Defendants, Appellees,

SYNTA PHARMACEUTICALS GROUP LONG TERM DISABILITY BENEFIT PLAN,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Montecalvo, Lipez, and Aframe,
Circuit Judges.

Mala M. Rafik, with whom Rosenfeld & Rafik, P.C. was on
brief, for appellant.

Scott K. Pomeroy, with whom Byrne J. Decker and Ogletree,
Deakins, Nash, Smoak & Stewart, P.C. were on brief, for appellees.

August 27, 2025

**MONTECALVO, <u>Circuit Judge</u>.** Plaintiff-Appellant Steven Bernitz ("Bernitz") was Senior Vice President of Corporate Development at Synta Pharmaceuticals ("Synta"). Bernitz has a long history of back problems, and in June 2014, he stopped working due to chronic back pain. For years thereafter, he received disability benefits under a long-term disability insurance plan administered by USAble Life ("USAble"). In 2019, however, USAble determined that Bernitz was no longer disabled due to various observed changes in Bernitz's lifestyle and medical condition, and accordingly terminated his benefits. The benefits termination started a lengthy phase of administrative reviews and litigation in federal court, which culminated in the district court below granting USAble's motion for summary judgment on all counts and leaving undisturbed USAble's initial decision to terminate Bernitz's benefits. We affirm.

## I.   Background

### A.   Factual and Procedural History

Bernitz has a history of hip and back surgeries dating back to 1999. In December 2013, Bernitz began working for Synta as a Senior Vice President of Corporate Development. As part of his employment benefits, Bernitz was covered by a long-term disability insurance plan issued and administered by USAble (the "Plan").

## 1.   The Plan

Several aspects of the Plan are relevant here.  The first is the Plan's definition of "disability," which is defined, in relevant part, as:

> [a]n injury, sickness, or pregnancy [that] requires that you be under the regular care of a physician, and prevents you from performing at least one of the material duties of your regular occupation with reasonable accommodations.  If you can perform the material duties of your regular occupation with reasonable accommodation(s), you will not be considered disabled.

The Plan in turn defines "material duty" as:

> the sets of tasks or skills required generally by employers from those engaged in an occupation.  [USAble] will consider one material duty of your regular occupation to be the ability to work for an employer on a full-time basis as defined in the policy.

The Plan requires beneficiaries to provide, upon USAble's request, prompt proof of continued disability which may include "medical records; hospital records; pharmacy records; test results; therapy and office notes; mental health progress notes; medical exams and consultations; tax returns; business records; Workers' Compensation records; payroll and attendance records; job descriptions; Social Security award and denial notices; and Social Security earnings records."  The Plan also permits USAble to require beneficiaries to undergo independent medical examinations and interviews to determine their continuing eligibility for

- 3 -

disability benefits.  If a beneficiary fails to "provide [USAble] with continuing proof of disability and the items and authorization necessary to allow [it] to determine [its] liability, [it] will not pay benefits."  Finally, the Plan grants USAble "the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the policy."

## 2.   Disability Claims Under the Plan and Social Security

In June 2014, Bernitz stopped working due to back pain. He submitted a disability claim under the Plan to USAble in October 2014, which USAble investigated and ultimately approved in March 2015.  For about five years thereafter, USAble paid Bernitz monthly disability benefits under the Plan's terms.  During this time, USAble routinely verified whether Bernitz remained eligible for disability benefits by, for example, administering a questionnaire on his activities and daily living habits, receiving Attending Physician's Statements from Bernitz's physicians on his medical condition, and monitoring his public records and social media accounts.

In December 2014, shortly after filing his claim for disability benefits under the Plan, Bernitz also applied for disability benefits under the Social Security Disability Insurance program.  This claim, after initial denials, was eventually heard before an Administrative Law Judge ("ALJ") in June 2018.  The ALJ shortly after that issued a written decision denying Bernitz's

- 4 -

Social Security claim, noting, among other things, record evidence of Bernitz "taking college classes, driving, taking walks up to half a mile, cooking, taking out the trash," "exercis[ing] regularly with a personal trainer," traveling to "Hawaii and National Parks in the southwest," and "spend[ing] about a month in San Diego house-hunting," activities which, taken as a whole, were "inconsistent with [Bernitz's] statements concerning the alleged intensity, persistence, and limiting effects of symptoms." Bernitz appealed this decision, but it was affirmed by the Social Security Appeals Council in August 2019.

Meanwhile, as Bernitz's Social Security claim wended through the administrative process, USAble continued to routinely receive and review Bernitz's medical information. Because USAble rests its termination of Bernitz's benefits under the Plan on alleged improvements to Bernitz's physical condition starting around 2018, we provide a brief overview of the most relevant medical assessments from around this time.

In May 2017, Bernitz's pain management specialist, Dr. Yogesh Patel, submitted a routine Attending Physician's Statement to USAble. In it, Dr. Patel noted that Bernitz takes gabapentin for pain management, should not sit more than one to two hours at a time, should not stand more than thirty minutes at a time, and should refrain from any repetitive lifting. The statement concluded: "Patient's condition is permanent and irreversible.

- 5 -

Surgery resulted in very minor symptom improvement. Medicat[ion] and its side effects make prolonged concentration very difficult or impossible." Dr. Patel followed up on this prognosis in a January 2019 Back Disorders Questionnaire, stating his belief that Bernitz would never return to the workforce in a full- or part-time capacity.

Dr. Stewart Russell, USAble's independent medical physician tasked with reviewing Bernitz's file, largely agreed with that assessment as well. In October 2017, after reviewing treatment records from twenty-one doctors, he wrote that "[b]ased on the insured's pain complaints, his myriad of low back surgical procedures, presence of osteoarthritis in both knees, [and his status after] decompression surgery to [his] shoulder, it is my opinion that the insured does not have the capacity to perform full-time sedentary or light work."

After USAble was informed of Bernitz's denied Social Security claim, USAble requested updated medical records from Dr. Patel; Dr. Ken Fujioka, Bernitz's endocrinologist; and Dr. Biraj Shah, Bernitz's primary care physician. These records suggested a marked, continuing improvement in Bernitz's condition. An office note from Dr. Shah in January 2018 said that Bernitz would be leaving for a ten-day trip to Baja, Mexico, and that his weight at that time was 288 pounds. An office note from Dr. Patel in April 2018 stated that Bernitz was requesting an injection in his knees

for an upcoming trip to Boston from California, and that his weight was 275 pounds. A note from Dr. Shah in August 2018 indicated that Bernitz's weight was down to 263 pounds due to steady exercise, that he was no longer taking gabapentin, and was "playing pickleball and walking 6 days a week, up to an hour at a time." Bernitz also had a travel consultation with Dr. Shah in March 2019 for a two-week safari to Africa, at which time his weight had further decreased to 231 pounds. Finally, a note from Dr. Patel in April 2019 reported that Bernitz "continues to report substantial relief and improved function with use of [painkiller] medications" and that Bernitz "reports he has recently lost 70 pounds and some of his other health issues have resolved."

USAble then ordered Bernitz to be surveilled in July, September, and November 2019 due to what it deemed "inconsistencies with [Bernitz's] reported activities and the information documented in his updated medical records." The surveillance reports indicated that Bernitz was seen walking and entering, exiting, and driving his car without any visible signs of discomfort or gait issues. He was also seen going to a gym to work out with a personal trainer, where he used a treadmill, lifted barbells, and did exercises on a weight machine.

This surveillance prompted USAble to order another medical review by Dr. Russell. This review incorporated updated records from ten of Bernitz's doctors. In October 2019, Dr.

Russell observed that Bernitz had "lost [a] significant amount of weight, thereby decompressing the low back area and allowing significantly increased activity" and concluded that "[b]ased on the totality of the medical information in the file, and based on a reasonable degree of medical certainty, my prior opinion has changed. My opinion is that the insured is no longer impaired from performing a full-time light physical demand occupation." The report also noted Bernitz's travel in 2018 and 2019 to places like Boston, Florida, Michigan, Mexico, and Africa. In a follow-up review in December 2019, during which he examined more updated records, including those related to a September 2019 hip surgery, Dr. Russell maintained his conclusion that Bernitz was no longer impaired.

### 3. Termination of Benefits

In December 2019, USAble sent Bernitz a letter terminating his benefits. It stated that:

> Based on a review of the updated medical records . . . while it is clear [Bernitz] suffers from a degree of chronic pain due to multiple failed back surgeries, his activity level has significantly increased since 2018 with the loss of approximately 70 pounds and a regular exercise regimen. He has reportedly been able to walk six days per week, play pickle ball, work out with a personal trainer for one hour three days per week (both with aerobic exercise and resistive training), travel within and outside the United States (including a 2-week African safari trip in July 2019), and continue his volunteer work,

for which he serves on multiple boards of directors.

### 4.    Internal Appeals and Litigation

In May 2020, Bernitz filed an initial appeal of USAble's decision through the insurer's internal appeals process.  In support, he submitted advocacy letters from Dr. Fujioka and Dr. Michael White, his acupuncturist; personal statements from himself and his wife; and a Functional Capacity Evaluation report by Barbara Tourtellott, an occupational therapist.  Dr. Fujioka's letter contained the following clarification regarding pickleball: "Basically the patient took a few lessons and attempted again once but was unable to play due his back[.]  There may have been some misunderstanding between myself and the patient if I stated anything about him playing pickle ball regularly as again he has not . . . ."[1]

USAble assigned Bernitz's appeal to a senior appeals consultant, Sandra Kaserman.  Another physician, Dr. Richard Maguire, conducted a review of Bernitz's updated records on USAble's behalf and issued a report in October 2020.  Dr. Maguire's report noted that Tourtellott's evaluation contained various inconsistencies and omissions, but because of conflicting information in the record and in light of Bernitz's most recent

---

[1] Three of Dr. Fujioka's visit notes from 2018 and 2019 state that Bernitz had "started playing pickle ball on his off days."

surgeries, he recommended that Bernitz attend an independent medical examination. Bernitz declined, however, expressing concerns about COVID-19. Kaserman thus opted to collect updated medical records and have a third-party vendor select a doctor to review the anthology of documents on Bernitz's condition.

The vendor selected Dr. Richard Kaplan, who is board-certified in pain medicine, to prepare another report examining Bernitz's latest medical records. Dr. Kaplan issued his report in December 2020, which echoed Dr. Maguire's issues with Tourtellott's evaluation and concluded that "[t]here are numerous inconsistencies in the medical records as well as in the claimant's statements which support that not only is impairment unsupported but rather that the claimant is both capable of an increased level of activity and that such an increased level of activity would likely be therapeutic in nature."

Bernitz requested time to respond to Dr. Kaplan's report, and in March 2021 said that he was being referred for neuropsychological testing; accordingly, he requested that USAble put off any final termination decisions until after the neuropsychological evaluation.

Between July and September 2021, Kaserman sent Bernitz addendum reports by Drs. Maguire and Kaplan, both of which affirmed their prior assessments despite new medical records relating to Bernitz's latest round of back surgery in the summer of 2021.

In October 2021, Bernitz submitted additional records, including a vocational assessment report by Michael LaRaia and a neuropsychological evaluation conducted by Dr. Kaaren Bekken. LaRaia's report stated that Bernitz "remains vocationally unemployable" while Dr. Bekken's evaluation concluded, based on findings of "significant cognitive impairment," that Bernitz was "incapacitated from his own occupation."

In response, Kaserman again sought a third-party vendor to select a physician to review Dr. Bekken's report. The vendor selected Dr. Malcolm Spica, who prepared a report in October 2021 concluding that Dr. Bekken "chose to interpret the claimant's average scores [on neurological tests] as representing impairment" even though "[n]o evidence was provided to support the statement." And Dr. Kaplan issued yet another review report in February 2022 in light of newly updated records, which again concluded that Bernitz was no longer impaired. Kaserman sent Bernitz these latest reports in February 2022, requesting a response within 21 days. Receiving none, Kaserman sent Bernitz a termination letter on March 9, 2022. The same day, Bernitz submitted a letter responding to Drs. Kaplan and Spica, along with an additional letter from Dr. Bekken.

Bernitz then commenced this suit on May 1, 2022.

In August 2022, USAble offered to commence a voluntary review of the letters that Bernitz sent on the same day that

Bernitz's appeal was denied. This final phase of the internal appeal process consisted of a flurry of exchanges among Drs. Spica, Kaplan, and Bekken critiquing each others' work, with no doctor changing their medical opinions.

In February 2023, USAble issued its final determination letter denying Bernitz's claim.

In June 2024, the district court ruled on the parties' cross-motions for summary judgment, resolving them both in USAble's favor and entering judgment for USAble.

This timely appeal followed.

**B.  ERISA**

Because this case is governed by a specific standard of review under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (codified as amended in scattered sections of 26 and 29 U.S.C.), we say a few words about the statute now.

USAble's Plan is regulated exclusively by ERISA because it is a privately administered employee benefit plan. See 29 U.S.C. § 1144(a) (ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan"). ERISA, among other things, "controls the administration of benefit plans as by imposing reporting and disclosure mandates, participation and vesting requirements, funding standards, and fiduciary responsibilities for plan administrators." N.Y. State

Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 651 (1995) (citations omitted). Denial of benefits under an ERISA plan are subject to a particularized and deferential standard of review, which we expand on below.

## II. Standard of Review

We review a district court's grant of summary judgment de novo. Field v. Sheet Metal Workers' Nat'l Pension Fund, 83 F.4th 59, 66 (1st Cir. 2023).

Our review of USAble's underlying termination decision, however, remains deferential. "Where, as here, the administrator of an ERISA plan is imbued with discretion in the interpretation and application of plan provisions, its use of that discretion must be accorded deference." Dutkewych v. Standard Ins. Co., 781 F.3d 623, 633 (1st Cir. 2015) (quoting Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 61 (1st Cir. 2013)). This means that "[a] reviewing court must uphold [the administrator's] decision unless it is 'arbitrary, capricious, or an abuse of discretion.'" Id. (quoting Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014)). In the ERISA benefit determinations context, the "arbitrary and capricious" and "abuse of discretion" standards are functionally equivalent. See id. at 633 n.6; Leahy v. Raytheon Co., 315 F.3d 11, 15 n.3 (1st Cir. 2002) (noting that the Supreme Court in Firestone Tire & Rubber Co. v.

- 13 -

Bruch, 489 U.S. 101 (1989), did not distinguish between "arbitrary and capricious" and "abuse of discretion" in this context).

At bottom, the question is whether an ERISA plan administrator's eligibility determination is "reasoned and supported by substantial evidence." Dutkewych, 781 F.3d at 633 (quoting Colby, 705 F.3d at 62). "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) (citing Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004) and Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)); see generally Leahy, 315 F.3d at 17-18 (discussing and resolving the seeming "discongruence" between the summary judgment standard of review and the arbitrary and capricious standard for ERISA cases).

## III. Discussion

Bernitz now argues that the district court erred in granting summary judgment to USAble for the following reasons: (1) it failed to fully examine USAble's structural conflict of interest as both adjudicator of claims and payor of benefits as required by law; (2) it failed to analyze whether USAble followed specific provisions of the Plan, including the Plan's narrow definition of "disability"; and (3) the record evidence conclusively establishes that Bernitz is disabled under the Plan's

definition of disability. For the following reasons, we cannot agree.

### A. Structural Conflict and Case-Specific Factors

Bernitz first argues that a structural conflict of interest, due to USAble serving both as the adjudicator of claims and the payor of benefits, infected USAble's denial of Bernitz's claim, rendering the denial of Bernitz's claim an abuse of discretion. While a structural conflict plainly exists, we disagree that it improperly influenced USAble's decision.

We take a moment to place the issue of structural conflicts in the wider context of abuse-of-discretion review. In Metropolitan Life Insurance Co. v. Glenn, the Supreme Court held that courts reviewing benefits determinations under ERISA for a plan administrator's abuse of discretion should "tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together." 554 U.S. 105, 117 (2008). One of these factors is the plan administrator's conflict of interest arising from its dual role of both evaluating and paying benefit claims.[2] Id. at 116-17. This factor

> should prove more important (perhaps of great
> importance) where circumstances suggest a
> higher likelihood that it affected the
> benefits decision, including, but not limited

---

[2] Another factor identified by the Glenn Court is procedural unreasonableness. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 118 (2008). However, Bernitz does not meaningfully contend with this factor, and we accordingly do not address it.

to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Id. at 117 (citations omitted). Beyond this factor, however, the Supreme Court disclaimed any "one-size-fits-all procedural system" for assessing abuse of discretion, recognizing that "[b]enefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts -- which themselves vary in kind and in degree of seriousness." Id. at 116. Our circuit has likewise declined to establish a "one-size-fits-all list of factors." Lavery v. Restoration Hardware Long Term Disability Benefits Plan, 937 F.3d 71, 79 (1st Cir. 2019). Instead, we summarized the ultimate abuse-of-discretion inquiry as asking: "To what extent has [the plan administrator] conducted itself as a true fiduciary attempting to fairly decide a claim, letting the chips fall as they may?" Id.

Equipped with this understanding, we turn to the particulars of this case. First, we must parse precisely what Bernitz argues on appeal, since it appears to us that he conflates how much weight we should place on the structural conflict factor

on the one hand, with the abuse-of-discretion analysis generally on the other hand. At one point, Bernitz asserts that the district court "erred in failing to assess whether USAble's conflicted role manifested in a biased, inaccurate claims process that led to an unreasonable termination of benefits." But Bernitz at another point acknowledges that the district court "addressed USAble's mitigation of its financial conflict [but] committed reversible error by failing to evaluate the more record-based, 'case-specific factors' in assessing the reasonableness of USAble's decision." We address each assertion in turn.

## 1. Structural Conflict

First, the district court affirmatively observed that "[b]ecause [USAble] both adjudicated Bernitz's claim and also bore responsibility for paying out benefits . . . a structural conflict exists." Bernitz v. USAble Life, No. 22-CV-10712-DJC, 2024 WL 3106249, at *8 (D. Mass. June 24, 2024). The district court then -- correctly, in our view -- "afford[ed] little weight to [the] same because [USAble] took sufficient steps to insulate its claims determination process." Id.; see Denmark v. Liberty Life Assur. Co., 566 F.3d 1, 9 (1st Cir. 2009) ("[C]ourts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts."). For instance, USAble employed third-party vendors to select independent

- 17 -

physicians to analyze Bernitz's medical records. It used a separate appeals unit to review the initial denial of Bernitz's claim. And it made good-faith benefit payments under reservation of rights while Bernitz appealed USAble's initial termination decision and USAble continued reviewing updated medical records. Each of these facts diminishes the weight that we place on the structural conflict here. See Glenn, 554 U.S. at 117.

Nor do we see contrary record evidence that merits putting more weight on the structural conflict. For example, the record does not reflect that USAble "has a history of biased claims administration," id., or that USAble provided blatantly inconsistent reasons for termination, or denied Bernitz a reasonable opportunity to respond to USAble's explanations as to why it deemed him no longer disabled under the Plan, cf. Lavery, 937 F.3d at 79-81.

Accordingly, we assign no error to the district court's analysis of the structural conflict present here.

### 2.   Case-Specific Factors

Second, Bernitz submits a list of purportedly "case-specific factors" which, by his telling, "suggest[] that [USAble's] structural conflict of interest continued to play a role":

- The Plan's "narrow" definition of disability, which requires Bernitz to show that he was unable to perform at least one of several duties of his position;

- The Plan's internal guidance requiring USAble to explain why it disagrees with Bernitz's experts;

- USAble's emphasis on its own consultants' opinions despite their alleged "failure to engage with the relevant evidence and the Plan standard";

- USAble's "selective review of contrary medical and vocational evidence";

- The district court's "misinterpretation of the S[ocial ]S[ecurity ]A[dministration]'s decision"; and

- USAble's reliance on Bernitz's weight loss, exercise, and travel.

Most of these, however, are not "case-specific factors" but rather characterizations of record evidence that is unfavorable to Bernitz. And we have already established that "[e]vidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." Wright, 402 F.3d at 74.

And as for USAble's alleged "misinterpretation of the SSA's decision," this too is not a case-specific factor. Neither do we see how the denial of Bernitz's Social Security claim bears

on USAble's structural conflict, since that claim was adjudicated in an entirely separate administrative process.

Finally, as for Bernitz's remaining contentions about the Plan's express terms, it is unclear how they relate to USAble's structural conflict, since they do not obviously describe structural aspects of USAble's and Bernitz's relationship that would motivate USAble to either deny or pay benefits. And so, we read his contentions as a more general attack on the analytical soundness of USAble's claim evaluation. Because a "flatly incorrect interpretation of the Plan" calls into question the ultimate fairness of USAble's evaluation, Lavery, 937 F.3d at 80, we consider his argument below.

## B.   Plan Terms

Bernitz argues that USAble failed to follow the express provisions of its own Plan -- namely, the Plan's definition of disability and its requirement that USAble explain any disagreement with or non-reliance on the medical assessments of Bernitz's treating physicians. Again, we disagree.

An abuse-of-discretion inquiry must "consider the text of the ERISA plan and the plain meaning of the words used therein, which cabin the plan's administrator's discretion." Santana-Díaz v. Metro. Life Ins. Co., 919 F.3d 691, 695 (1st Cir. 2019) (citing Colby, 705 F.3d at 65). "[O]nce a plan is established, the administrator's duty is to see that the plan is 'maintained

pursuant to [that] written instrument.'" Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108 (2013) (quoting 29 U.S.C. § 1102(a)(1)) (second alteration in original). However, "[u]nder [the ERISA] standard, we need not decide the 'best reading' of the Plan. We need only consider whether [the administrator's] interpretation of the Plan and its application of the Plan terms to the facts of this case was 'reasoned and supported by substantial evidence.'" O'Shea through O'Shea v. UPS Ret. Plan, 837 F.3d 67, 73 (1st Cir. 2016) (quoting Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 94 (1st Cir. 2008)).

We thus turn to the Plan terms at issue: the definition of disability and USAble's obligation to explain where and when it departs from the assessments of Bernitz's physicians. Examining each, we conclude that USAble's interpretation and application of the terms were reasoned and supported by the administrative record.

### 1.   Plan Definition of Disability

As a reminder, the Plan defines "disability" as:

> [a]n injury, sickness, or pregnancy [that] requires that you be under the regular care of a physician, and prevents you from performing at least one of the material duties of your regular occupation with reasonable accommodations. If you can perform the material duties of your regular occupation with reasonable accommodation(s), you will not be considered disabled.

And it defines "material duty" as:

- 21 -

the sets of tasks or skills required generally by employers from those engaged in an occupation. [USAble] will consider one material duty of your regular occupation to be the ability to work for an employer on a full-time basis as defined in the policy.

USAble conducted a vocational assessment for Bernitz's job to more specifically define the set of tasks and skills that relate to his role as marketing executive. The assessment identified the following physical demands required by that role:

- "Frequent: Sitting (position changes)[;] Fingering/Keyboarding[;] Reaching[;] 10 lbs. Lifting/Carrying[;] 10 lbs. Pushing/Pulling[;]"

- "Occasional: Handling[;] Crouching[;] Standing[;] Walking[;] 20 lbs. Lifting/Carrying[;] 20 lbs. Pushing/Pulling[;] Traveling."

The parties appear to agree that, putting all this together, Bernitz would be disabled under the Plan if he could not perform at least one of the physical demands identified in the vocational assessment.

Bernitz argues that USAble never applied this framework for disability to the evidence. In particular, he claims that USAble never explained whether the alleged improvements in Bernitz's condition which occasioned the benefits termination meant that Bernitz could now perform every single occupational duty listed above and that USAble had Bernitz's medical records

- 22 -

evaluated without also providing its reviewers the Plan's standard of disability.  However, that is not what the record shows.

First, USAble's termination decision rests heavily on Bernitz's significant weight loss and its attendant health and back pain benefits; his travel to domestic and international destinations, including a safari in Africa; and reports of Bernitz taking college classes, driving, walking up to half a mile, exercising with a personal trainer, and playing pickleball.  We find that these justifications, documented in Bernitz's medical files and surveillance reports, reasonably support the conclusion that Bernitz was able to perform every single material duty identified in the vocational assessment.[3]

Second, USAble clearly did share the Plan definition of disability with the independent reviewers: the medical review forms in question specifically analyze Bernitz's physical capabilities with respect to the physical tasks identified in the vocational assessments, which the parties agree determine the

_____

[3] For similar reasons, we also reject Bernitz's argument that USAble improperly used the "[Social Security] total disability standard" instead of the Plan's definition. First, Bernitz neither provides what that standard is nor meaningfully explains how it differs from the Plan's definition. Cf. 20 C.F.R. § 404.1520(f) (Social Security Disability Insurance definition of disability: "Your impairment(s) must prevent you from doing your past relevant work."). Second, USAble's termination letters open by explicitly stating the Plan's definition of disability; they do not cite or reference the Social Security definition. Thus, we cannot agree that USAble employed the wrong disability standard, or that its disability determination was analytically flawed.

meaning of disability under the Plan. See Bernitz, 2024 WL 3106249, at *9 n.5. And at any rate, the Plan's definition of disability and the job tasks identified by the vocational assessment do not comprise a hyper-technical rubric. Rather, they form a common-sense description of the daily routine of a marketing executive: sitting, typing, standing, walking, and occasionally traveling. The administrative record supportably shows that Bernitz could meet every enumerated physical demand by the time USAble terminated his benefits.

We thus conclude that USAble both properly identified the Plan's definition of disability and applied it to the administrative record.

### 2. Disagreement with Treating Physicians

Bernitz next contends that USAble failed to explain why it disagreed with Bernitz's treating physicians' conclusions that he was disabled, as the Plan required. While we agree that the Plan requires this kind of explanation, we disagree that USAble failed to provide it.

USAble's own policies require adverse benefit determination letters to explain, among other things, "the basis for disagreement with or non-reliance on: views of health care

professionals treating the claimant and vocational professionals who evaluated the claimant."[4]

By our read, USAble's determination letters did just that. For instance, USAble's 2019 letter engages with the 2017 Attending Physician Statement from Bernitz's pain management specialist Dr. Patel, including and especially Dr. Patel's diagnosis of failed back syndrome and observation that Bernitz's condition "is permanent and irreversible." The letter also discusses Dr. Patel's 2019 Back Disorders Questionnaire in which Dr. Patel described Bernitz's pain level as "severe" and noted "Mr. Bernitz would never be able to return to the workforce in a part-time or full-time capacity."

USAble's 2019 letter then continues to summarize records obtained from more than thirty of Bernitz's medical providers which document, among other things, Bernitz's vaccinations and injections for domestic and international trips in 2018 and 2019;

---

[4] Bernitz also traces this obligation to a 2018 Department of Labor regulation, 29 C.F.R. § 2560.503-1(j)(6), which he contends supplants an observation made by the Supreme Court in Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), that administrators need not explain their reliance on evidence that conflicts with a treating physician's evaluation until the Department of Labor directs them to do so. While we disagree with Bernitz's account of Nord -- the relevant portion addresses whether to "accord extra respect to treating physicians' opinions," id. at 831, not how much explication is required when disagreeing with them -- we observe at any rate that the 2018 regulation is in relevant part materially identical to the language found in the Plan.

that he played pickleball and walked six days per week, for up to an hour at a time; his markedly lower blood pressure; his ceased use of gabapentin; and his loss of roughly seventy pounds due to regular exercise. It then summarizes what rounds of surveillance revealed: Bernitz walking and entering, exiting, and driving his car with no signs of pain or gait issues; and going to a gym to work out with a personal trainer, which included using a treadmill, lifting barbells, and using a weight machine to perform pull-downs and leg extensions. The 2019 letter concludes: "while it is clear [Bernitz] suffers from a degree of chronic pain due to multiple failed back surgeries, his activity level has significantly increased since 2018 with the loss of approximately 70 pounds and a regular exercise regimen."

And USAble's 2022 letter, occasioned by Bernitz's appeal of the 2019 termination decision, also explained that two independent physicians found inconsistencies and deficiencies in a March 2020 Functional Capacity Evaluation that Bernitz underwent. It then proceeded to explain those flaws in detail.

These determination letters, we think, amply explain why USAble disagreed with the "views of health care professionals treating [Bernitz] and vocational professionals who evaluated [him]": at bottom, substantial evidence regarding Bernitz's lifestyle and activities contradicted the assessment that Bernitz

could no longer sit, stand, and occasionally travel as required by his vocation.

We thus conclude that USAble satisfied its burden of explication under the Plan.

## C.    Record Evidence

Finally, Bernitz assails the evidentiary basis on which USAble concluded that he is no longer disabled under the Plan. Bernitz mainly challenges the reliability of unfavorable reports and medical assessments and argues that favorable, conflicting evidence should have prevailed over the adverse evidence. Constrained by the standard of review, however, we see no basis for overturning the district court's judgment.

There is no doubt that the administrative record here, amounting to some 8,000 pages, permits conflicting inferences regarding Bernitz's ability to do his job as defined by the Plan around the time that USAble terminated his benefits. However, it is emphatically not our place to "review the ingredients of the administrative record de novo, without deference to the plan administrator's findings." Leahy, 315 F.3d at 18. Rather, as we have explained, we ask only the following: is USAble's decision to terminate Bernitz's benefits "reasoned and supported by substantial evidence[?]" Dutkewych, 781 F.3d at 633 (quoting Colby, 705 F.3d at 62).

- 27 -

We think it is.  USAble's account of the record -- as set forth in its 2019 and 2022 determination letters -- is sufficient for us to find that USAble's decision was backed by well-developed reasons based on substantial documented evidence of Bernitz's improved condition by the time USAble deemed him no longer disabled.

## IV.  Conclusion

The judgment of the district court is therefore **<u>affirmed</u>**.